Don **HERZING, et al., Appellants,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY and Metropolitan Insurance and Annuity Company, et al., Appellees.**

No. 13–93–394–CV.

Court of Appeals of Texas, Corpus Christi.

June 9, 1995.

Rehearing Overruled Sept. 28, 1995.

Thomas J. Sims, Wanda M. Fowler, Rachel A. Fefer, Fouts & Moore, Houston, for appellants.

Cynthia Hollingsworth, Richard L. Nelson, John E. Castaneda, Stacy R. Obenhaus, Virginia W. Pennington, Gardere & Wynne, Dallas, for appellees.

Before DORSEY, DALLY[1] and JACKSON B. SMITH, Jr.,[2] JJ.

## OPINION

JACKSON B. SMITH, Jr., Justice (Assigned).

Appellants[3] filed suit for damages against former employers of Donald S. Bryant, Jr., which were Metropolitan Life Insurance Company, Metropolitan Insurance and Annuity Company, and others.[4] The basis for the suit was that Bryant's activities as an employee of the insurance companies constituted fraud, violations of the Deceptive Trade Practice Act, Insurance Code violations, breach of contract of fiduciary duty against appellants. Based on jury answers to the court's charge, the court entered a take nothing judgment.

Appellants seek reversal based on alleged errors by the trial court in (1) excluding certain proffered evidence, (2) limiting recovery of damages in a submitted question by using the wrong measure of damages, and (3) refusing to submit a defendant's requested question as to the "benefit of the bargain."

## BACKGROUND

Donald S. Bryant, Jr. (Bryant) was an insurance agent for New York Life Insurance Company from 1967 to July 1989. In 1989 he was recruited and hired by Metropolitan Life Insurance Company (Met Life) as an agent in the Houston area.

In 1988, prior to leaving New York Life, Bryant started a loan brokering business which he called Inveco and Associates. Inveco was not a corporation but an assumed name.

In his brokerage business, Bryant represented to potential borrowers that for a brokerage fee he could obtain loans that would be non-recourse on the borrowers, and would be a zero pay-back, self liquidating loan. By this plan, the borrower not only did not have to repay the loan, but also had to pay no interest. He advised each borrower that the funds paid in on the purchase of a life insurance policy or an annuity would generate sufficient income to pay off the loan. The amount of the insurance required apparently depended on the amount of the loan sought. He required that his brokerage fee on loans be paid "up front."

After Bryant received his up-front brokerage fee and had obtained a life insurance policy or commitment for an annuity from the potential borrower, he gave various reasons to the borrower why the loan was not forthcoming. Appellants filed this suit after Bryant continued making excuses why the loans were not made.

Bryant operated his brokerage business out of the office or space furnished to him by the insurance company for which he was employed. In that office he kept his personal fax machine and records, and operated his brokerage and insurance business on company premises.

Don Herzing and his wife, Suzanne, operated a home for neglected and abused children. This business was called Nueva Vista Development Center but the title was a d/b/a for the N.V. Development Service, Inc., a non-profit corporation owned by the Herzings. The Herzings wanted to borrow money to expand and offer new programs at Nueva Vista. They alleged that based on representations made by Bryant that he would get them a self-liquidating $700,000

---

1. Assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003 (Vernon 1988).

2. Assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003 (Vernon 1988).

3. Don Herzing; Suzanne Herzing; N.V. Development Services, Inc. d/b/a Nueva Vista Development Center; Multi–Communications, Inc.; Mary J. Lindsay; Ralph Lindsay; George W. Davis, individually and d/b/a Helena Oil Compa-

ny; Roger Titlow; Lydia Tamez–Titlow; and Tigra International, Inc.

4. New York Life Insurance Company; Donald S. Bryant, Jr., individually and d/b/a Inveco and associates; R & D Financial Services Inc.; Don M. Weiss, Individually; Nelson Property Management Company, Inc. d/b/a Nelson Financial Services; Shelby J. Lee, individually; Stan German, individually. New York Life settled with appellants; all other appellees, except The Metropolitan Life Companies, were dismissed from the suit upon appellants' motion.

578

loan with Met Life, they paid up-front bro-
kerage fees of $7,500 to Bryant, and pur-
chased a $3,500,000 life insurance policy. No
loan was obtained, and the up-front money
was not refunded.

Mary Lindsay owned Multi–Communica-
tions, Inc., a dormant corporation. She and
her husband, Roger, were trying to locate
funding for the corporation to establish a
cable TV system and other projects. They
alleged that in December 1989, discussions
between Bryant and themselves commenced
concerning Bryant's brokerage of a loan. In
the discussions, Bryant represented that he
could obtain a self-liquidating $55,000,000
loan with Met Life. He required a $75,000
up-front brokerage fee to consummate the
loan and the purchase of a $500,000 annuity
on each of them. The brokerage fee was
paid, but no loan was obtained and the up-
front money not refunded.

George Davis worked for a company that
manufactured microbes. He stated that he
met Bryant in December, 1988 when Bryant
was soliciting insurance business at the mi-
crobe company. He alleged that when
Bryant became aware that he was interested
in buying a Costa Rican shrimping company
and would need a loan to make the purchase,
Bryant approached him about brokering a
self-liquidating type loan with Met Life. Af-
ter numerous meetings, he agreed to pay
Bryant an up-front brokerage fee of $5,000
and purchase a $1,000,000 annuity with Met
Life. In return, Bryant was to obtain a
$5,650,000 loan from Met Life for Davis.
The $5,000 was paid to Bryant, but the loan
was never made and the up-front money not
refunded.

Roger Titlow and his wife, Lydia, owned
Tigra International, a corporation without as-
sets. They were interested in obtaining a
loan for Tigra for the purpose of building oil
storage tanks and cotton module builders.
They met Bryant in 1988 while he was em-
ployed by New York Life. Bryant was
aware of their desire to obtain a loan and
informed them that he could get them a self-
liquidating type loan with New York Life.
He later changed his employment to Met
Life but said the same type loan could be
obtained with Met Life. Thereafter, they

agreed to pay Bryant a $5,000 up-front bro-
kerage fee and purchase a $400,000 life in-
surance policy on Roger Titlow with Met
Life. In return Bryant would obtain a
$1,500,000 loan for Tigra from Met Life.
The $5,000 was paid, but no loan was ob-
tained and the up-front money not refunded.

I.

In appellants' first point of error, they
assert that the trial court erred in excluding
the testimony of Joseph Jennings concerning
the substance of his telephone conference
with a person Bryant said was John Holley.

Appellants assert that the excluded portion
of Jennings' testimony was crucial to their
case because it was evidence that someone
with apparent authority at Met Life had
knowledge of and approved of Bryant's loan
brokerage activities while he was an agent of
Met Life. They point out that there was
other circumstantial evidence that Met Life
was aware of Bryant's brokerage activities
but Jennings' excluded testimony was the
only direct evidence of Met Life's actual
knowledge of Bryant's activities. Appellants
contend that Jennings' testimony was not
hearsay as the appellees contended before
the trial court.

Jennings testified that he was president of
Waste Microbes. He stated he met Bryant
in December, 1989 when Bryant came to
Waste Microbes trying to sell various types
of insurance for Met Life. At a subsequent
meeting, Bryant told him that he was getting
a loan for Davis but could increase the loan
whereby Waste Microbes would receive suffi-
cient funds for an expansion to build a bacte-
ria plant. He stated a package was prepared
seeking a conventional loan from Met Life.
When the loan did not proceed, Bryant stat-
ed, "Well, we can get you a self-liquidating
loan." Several discussions followed in which
Bryant assured Jennings that he had author-
ity from the management of Met Life to
make the loan, and still later, that Met Life
had approved a $5,650,000 loan. Jennings
informed Bryant that he needed further dis-
cussions with someone "further up" in the
management of Met Life about the loan. At
that time, Bryant said he would get his man-
ager, John Holley, on the phone. Bryant

dialed a phone number, talked about 5 minutes to the person on the line, told Jennings it was John Holley on the phone, and handed the phone to Jennings. The telephone conversation that ensued was excluded by the court on the basis of hearsay. Appellants made a bill of exceptions of Jennings' excluded testimony. However, prior to making their bill, appellants put on testimony by Jennings that he had listened to the oral portion of Holley's video deposition and identified Holley's voice as being the same voice he had heard during the phone conversation.

On the bill of exceptions, Jennings testified, that in their phone conversation, Holley told him that he was a branch manager for Met Life and Bryant worked for him. He said that: (1) loans were made locally, (2) he was on the loan committee, (3) that a self-liquidating loan of $5,650,000 had been approved, (4) a commitment letter would issue within 72 hours, and (5) a cashiers check for $5,000 was needed. Jennings said he was further told that the loan would close within 30 days, and if for some reason the loan did not close, the $5,000 would be refunded. Jennings said he agreed to Holley's proposed procedure, and told Holley that a check would be sent to Metropolitan Life. He then returned the phone to Bryant.

Appellees objected to the excluded evidence on the basis that such evidence was (1) hearsay, (2) that a proper predicate could not be presented to overcome the language of Rule 802(2)(C), and (3) the predicate required in Texas Rule of Civil Evidence 901(6) for authentication or identification of the voice in a telephone conversation could not be met by appellants.

"Hearsay" is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX.R.CIV.EVID. 801(d).

Statements which are not hearsay are set forth in Rule 801(e). Appellants assert that Jennings excluded testimony was an "admission by party opponent" and admissible under Rules 801(e)(2)(C) and (D). These rules state, "a statement is not hearsay if the statement is offered against a party and is ... (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship...." TEX. R.CIV.EVID. 801(e)(2)(C),(D).

Appellants assert that the real questions to be asked in determining whether the excluded Jennings telephone conversation fell within rule 801(e)(2)(C) and (D) are, did Holley have authority whether apparent or actual to (1) talk about Bryant's scope of authority under Holley's control? and (2) his own scope of authority as branch manager? As authority for their assertion appellants cite *Celtic Life Ins. Co. v. Coats,* 885 S.W.2d 96 (Tex. 1994).

Although *Celtic* discusses agency, it does not address the hearsay issue that is presently before us. The question in *Celtic* was whether an insurance company could be held liable where the company's insurance agent made an erroneous representation concerning the policy coverage. *Id.*

The entire excluded phone conversation pertained to the loan and who had authority to approve the loan. Thus, after the phone conversation, Davis gave Bryant a $5000 upfront brokerage fee because of statements made to him by Jennings, and because of statements made to Jennings in a telephone conversation with a third party who Bryant said was Holley. The third party's identification was not established by Jennings during the phone conversation.

The content of Jennings' conversation was offered as an admission by Met Life on two bases (1) a statement by a person authorized by Met Life to make a statement concerning the subject matter, *see* TEX.R.CIV.EVID. 801(e)(2)(C), and (2) a statement by Met Life's agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship. *See* TEX.R.CIV.EVID. 801(e)(2)(D).

Appellees contend first, that the telephone conversation was not admissible under an exception to the hearsay rule. We find no merit to this contention because this evidence was proffered not as hearsay but under Rule

801(e) which are "statements which are not hearsay."

■ Appellees next contend that the telephone conversation could not properly be offered under Rule 801(e)(2), the "admission by party-opponent" rule, because Holley is not a party to this suit but only an agent for Met Life. We disagree with this contention because an insurance company is generally liable for any misconduct by an agent that is within the actual or apparent scope of the agent's authority. *See Royal Globe Ins. Co. v. Bar Consultants Inc.,* 577 S.W.2d 688, 693–94 (Tex.1979).

In the instant case, Bryant, as agent, stated he had authority to broker the loan for Met Life. The person who talked to Jennings on the phone stated that Bryant had authority to broker the loan, and, as a branch manager, Bryant worked for him. He also stated that loans were made locally, that he was on the loan committee, and that the loan had been approved. This evidence, if admitted, would not only show that Bryant was authorized to make statements about obtaining a loan with Met Life and was within the scope of his agency, but also that he approved the loan as a branch manager for Met Life.

■ It is uncontested that Holley was a branch manager for Met Life and this is some evidence of apparent authority. Under these facts, we believe that Jennings' excluded testimony was admissible under Rule 801(e)(2)(D), if appellants laid the proper predicate required under Rule 901(b)(6) for authentication or identification of Holley's voice.

The general provision under Rule 901 states:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

TEX.R.CIV.EVID. 901(a).

In section (b) of Rule 901, by way of illustration only, and not by way of limitation, the rule sets forth various illustrations. Illustration number (6) entitled "Telephone conversations" states:

> Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (A) in the case of a person, circumstances, including self identification, show the person answering to be the one called....

TEX.R.CIV.EVID. 901(b)(6).

The evidence in this case shows that Jennings did not know the telephone number dialed and the person he talked to did not identify himself to Jennings. At that time Jennings relied upon Bryant's statement that this was Holley, his Branch Manager. Jennings had never met or talked to Holley.

After this lawsuit was filed, Jennings visited with appellants' attorney and discussed the case. After Holley's video deposition was taken, Jennings went to appellants' attorney's office, listened to the audio portion of Holley's deposition and identified the voice as the same he had heard in the phone conversation.

■ Rule 901(b) makes it clear that the illustrations given therein are just that; and are not by way of limitation. It is not essential that a person know the phone number dialed to establish an identification. Knowledge of the phone number is only one type of evidence that aids in establishing who is being called. An example of when it is not necessary to establish a phone number in identification is when the declarant is receiving the call and is able to establish by other evidence who made the call. *See Liberty Mutual Insurance Co. v. Preston,* 399 S.W.2d 367, 370 (Tex.Civ.App.—San Antonio 1966, writ ref'd n.r.e.).

In *Preston* a garage operator's testimony concerning the content of a telephone call he received was admitted into evidence to establish the identity of the caller because the facts related to him by the caller were facts that only one person would have known. The garageman never met or talked to the caller except in the one telephone conversation.

In the instant case, Bryant told Jennings that Holley was on the phone. The person with whom Jennings spoke not only identi-

fied himself as Bryant's manager, but also was familiar with all of the facts of Bryant's loan proposal.

■ In our opinion, the facts in this case, if true, were sufficient to meet the predicate requirements of Rule 901. Whether the facts were not trustworthy, as suggested by the appellees, is a fact question to be determined by the fact finder, the jury in this case, not the court. The court's function was to determine admissibility; not the creditability of the witnesses' testimony.

■ Because we have found that a proper predicate was laid for authentication of the phone conversation, and because we have found that the content of the phone conversation should have been admitted into evidence by the trial court, we must determine whether such errors probably resulted in an improper judgment. *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex.1992). To make the determination of whether the case turns on the excluded evidence, we review the entire record. *Boothe v. Hausler*, 766 S.W.2d 788, 789 (Tex.1989).

The voluminous record in this case consists of approximately 6000 papers. Although we have heretofore set forth numerous facts, there are other relevant facts.

There is evidence in the record that none of the appellants were required to put up any collateral for the self-liquidating loans. The loans were to be made without recourse on appellants, bare no interest, and were self-liquidating with zero pay-back. The amount of the proposed loans ranged from $700,000 to $55,000,000.

The Herzings paid Bryant $7250 brokerage fees before Bryant was employed by Met Life. There is evidence that the loan was to be made to the N.V. Development Services d/b/a Nueva Vista Development Center, but any loan proceeds would have been paid directly to the Herzings, not to the non-profit children's home, Nueva Vista.

Don Herzing recorded numerous telephone conversations between himself and Bryant; however, no one else was contacted or talked to at Met Life by Herzing.

The Lindsays had taken bankruptcy not too long before they met Bryant. In addition to the other facts heretofore detailed about the corporation that Mary Lindsay owned, the evidence shows she paid $1.00 for the corporation. The evidence shows that the corporation was not only dormant but had no assets, no business, and no business prospects. The proposed $55,000,000 loan was to be made to the corporation, but the loan proceeds were to be paid one-half to the corporation and one-half to Mary Lindsay.

George Davis testified that he had been involved in other "free money" deals or an "arbitrage loan." He stated that the $5,000 brokerage fee check made to Metropolitan Life Insurance had been returned to him by Bryant. Bryant told him that the check needed to be made to D.R. Weiss of R & D Financial Company. He had a new $5,000 check made to Weiss and gave it to Bryant. The check was endorsed by Weiss but Davis did not know who got the money. On the face of the check introduced into evidence there was no reference to Met Life or any indication that Met Life was involved in any manner with the check other than the fact that the check was given to Bryant.

On cross-examination, concerning the purchase of the Costa Rican shrimp company, Davis stated he was to be in partnership with a Costa Rican partner. He could not remember the name of the person who was to be his partner.

The Titlows paid a $5,000 brokerage fee to Bryant, $4,500 of which was paid while Bryant was with New York Life. The $1,500,000 loan proceeds were to be paid into Tigra International which had no employee and no business. To obtain the loan, Roger Titlow agreed to give Bryant an interest in Tigra. The Titlows never contacted anyone at Met Life concerning the proposed loan. Mr. Titlow knew and had talked to Bryant's supervisor at New York Life, but did not discuss the proposed loans during those conversations.

The above evidence along with the evidence heretofore enumerated, gave the jury a clear picture of appellants and Bryant as well as the goals of the respective parties. At the time of Jennings telephone conversa-

tion, the jury had been presented evidence that Davis was seeking a loan with Met Life. It also knew that Davis, as well as Jennings, wanted assurance that Bryant had authority to commit Met Life to making the loan. The jury further knew that Davis would not give the $5,000 up-front brokerage fee to Bryant until he received assurance from someone "further up" with Met Life. Finally, the jury knew that, as a result of Jennings phone conversation, Davis gave Bryant a check for the $5,000 brokerage fee. Davis' issuance of the brokerage check, after the telephone conversation, indicated that he had received all the assurance he needed. Holley testified that he had never met Jennings and had never had a telephone conversation with Jennings.

In our opinion, the admission of Jennings excluded telephone conversation would have given the jury more details regarding the assurances Davis received about Bryant's authority. More details were not necessary because it was obvious from the facts that Davis gave Bryant the $5,000 check only after the Jenning's phone conversation.

In their briefs and in their oral arguments appellants have not indicated what specific questions submitted to the jury would have probably been answered different if the excluded Jennings telephone conversation had been admitted. We choose not to speculate.

We find that the trial court erred in excluding the Jennings telephone conversation, however, we hold that such error did not probably result in an improper judgment.

Appellants' first point of error is overruled.

## II.

In appellants' point of error two and three, they assert that the trial court erred in excluding (1) letters and memoranda in New York Life's personnel files concerning Bryant's character and employment history with New York Life; and (2) the testimony of Dale Wibbert concerning similar matters. This evidence was offered by appellants to show that Met Life was negligent in hiring Bryant and in supervising him after he was employed.

The record in this case shows that a previous trial resulted in a mistrial. It also shows that prior to the commencement of the present trial appellants settled with New York Life, and dismissed all party defendants except the Met Life Companies.

We cannot ascertain from the record whether appellants obtained the excluded personnel files prior to filing this suit, after suit was filed, or after appellants settled with New York Life. Such information would have assisted us in resolving this point of error because appellants appear to infer that the exhibits were also available to Met Life before it hired Bryant.

The excluded evidence from New York Life's files consisted of 41 exhibits of inter-office correspondence between Bryant's immediate supervisors and higher officers. We do not include the content of all exhibits in this opinion because of their length. However, contained in the exhibits are various statements about Bryant: "a difficult agent"; "A source of embarrassment to New York Life"; ". . . this matter be resolved with Don Bryant before something of a more serious nature develops"; "improperly advised insured of policy provisions"; "failure to maintain proper standards and ethics"; "not an asset to New York Life"; "operates in a slipshod manner"; "complaints on Bryant having been coming for years"; "failed in meeting your field underwriting responsibilities"; and "does not know the difference between telling the truth and telling a lie." These statements as well as two company reprimands contained in the file were made between 1976 and 1989.

The evidence shows that Bryant, while still working for New York Life, was talking to Met Life about becoming an agent for Met Life. As a result of these conversations, Met Life sent two form letters to New York Life seeking information about Bryant and inquiring whether Bryant was eligible for rehire. New York Life did not respond to these inquiries. There is evidence that Holley contacted three New York Life agents to obtain information on Bryant, but those agents did not know Bryant. There is also evidence by New York Life managerial personnel that they, as a matter of policy, would not divulge

any information concerning a former agent to other companies, including an agents reputation. Although, one manager stated that a rehiring inquiry could be answered, but others testified that they would not answer such inquiries and would send them to their New York office. None of these witnesses knew how the New York office handled such inquiries.

Appellants assert that Dale Wibbert's excluded testimony shows that he knew Bryant's bad reputation at New York Life and that his testimony was relevant to the issue of Met Life's negligence in hiring Bryant. In this connection, Wibbert testified that he was an office manager with New York Life while Bryant was an agent for that company. He stated that his duties did not include the hiring, firing, supervising, or instructing of agents but only the management of the office and the oversight of other office employees. He stated that although he may have placed papers in Bryant's file, he did not recall reading any papers in Bryant's file and did not know Bryant's reputation. He did testify that he overheard a New York Life branch manager making comments about Bryant.

Wibbert also testified that he was still employed by New York Life when Bryant left that company. Wibbert stated that sometime later, he talked with Bryant who was employed by Met Life. As a result of those conversations, he applied for employment with Met Life and was hired as an agent. He later became an office manager at Met Life with duties similar to those he had with New York Life.

█ The admission and exclusion of evidence is committed to the trial courts sound discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex.1995). A person seeking to reverse a judgment based on evidentiary matters needs to prove that the error probably resulted in an improper judgment. *Id.* Reversible error does not usually occur in connection with evidentiary rulings unless appellant demonstrates that the whole case turns on the particular evidence excluded or admitted. *See Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 837 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert.*

*dism'd.*, 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988).

█ We first consider appellants' contention that the excluded information in Bryant's New York Life's file and excluded Wibbert testimony were accessible to Met Life before Bryant was hired by Met Life. The evidence in this case does not support this contention.

Appellants did not introduce evidence of the standard of care required in the insurance industry for gaining information about a prospective agent from another insurance company. They did proffer evidence that showed New York Life personnel would not divulge any information about an agent's reputation. There was a variance in the testimony concerning whether New York Life personnel would respond to a question of rehiring, but the fact is that New York Life did not respond to the two inquiries sent by Holley seeking information about Bryant.

Appellants proffered evidence that Holley was negligent and did not follow the hiring procedures set forth in Met Life management manuals. The negligence asserted was that the manuals required Holley to get his regional manager's approval before hiring an agent. Holley did not get this approval. Appellants have not made it clear how Holley's failure to follow company procedure had a bearing upon Met Life's ability to access Bryant's file from New York Life.

Appellants contend that Wibbert's testimony was more evidence that Bryant had a bad reputation at New York Life. Although Wibbert testified he did not know Bryant's reputation, there was evidence that he was aware of the branch manager's dissatisfaction with Bryant. Appellants' contention has merit but fails to show how Met Life could have gained access to such information from Wibbert.

Appellees assert that the excluded evidence was not only unaccessible to Met Life, but also was highly inflammatory. They argue that Met Life could not have received a fair trial because the case would have been tried on the events that occurred at New York Life, not the facts of this case. They contend that Rule 403 of the Texas Rules of

Evidence permits the exclusion of highly inflammatory evidence, if its admission would result in an unfair trial.

Under Rule 403, a trial judge may exclude relevant evidence if "its probative value is outweighed by the damage of unfair prejudice...." *See Dudley v. Humana Hosp.*, 817 S.W.2d 124, 126 (Tex.App.—Houston [14th Dist.] 1991, no writ); *Harrison v. Texas Employers Ins. Ass'n.*, 747 S.W.2d 494, 498 (Tex.App.—Beaumont 1988, writ denied).

Appellants also assert that Holley was negligent in supervising Bryant. The evidence they cite is that Bryant had informed Holley of his brokerage business while Holley was still with New York Life. Holley testified that he told Bryant he could not conduct this type business while employed Met Life and he had to dispose of any of the brokerage business he still had. This conversation occurred prior to the time Bryant was employed by Holley.

Based on the evidence in the record, we hold that the trial judge did not abuse his discretion by excluding the evidence in question for two reasons. First, the evidence was not accessible to Met Life before it hired Bryant as an agent. Second, when we weigh the highly inflammatory nature of the evidence contained in New York Life's personnel file kept on Bryant against all other evidence in the case, we conclude that, its probative value is outweighed by the danger of unfair prejudice and probably would have caused the rendition of an unjust and improper judgment.

Appellants' second and third points of error are overruled.

### III.

■ In appellants' point of errors four through seven, they contend that the trial court erred in excluding evidence of mental anguish suffered by Mary and Ralph Lindsay, and Lydia and Roger Titlow.

Appellees assert that it is not necessary to discuss appellants' points of error four through seven, if this Court affirms the trial court judgment on the liability issues. Appellees maintain that such discussion would be academic and serve no useful purpose.

Appellants disagree. Each of the parties have cited cases to support their position but all such cases are distinguishable.

■ All intermediate appellate courts in Texas have been under instructions from the Texas Supreme Court for many years to dispose of all points of error in an appeal except in cases where the merits of the case need not be reached. We will discuss all points of error.

Appellees contend that (1) the proposed loans were to be made to Multi–Communications, Inc. and Tigra International, both corporations; (2) the Lindsays and Titlows were stockholders in the respective corporations; (3) all of the actions of appellant were directed toward getting corporate loans; (4) a corporate stockholder may not recover damages for a wrong done to a corporation; and (5) the evidence of mental anguish was properly excluded.

Appellants contend that the mental anguish evidence should have been admitted because they have alleged a personal action against Met Life, separate and apart from the corporate causes of action, and that they were entitled to mental anguish damages for violations of the Texas Deceptive Trade Practice Act and the Texas Insurance Code.

■ There is no disagreement between the parties that a corporate stockholder does not have a derivative action where the wrong has been committed only against a corporation. Too, there is no disagreement between the parties that a stockholder may have a cause of action against a third party where there is a direct injury to the stockholder in the stockholder's individual capacity and such claim is independent of any duty owed to a corporation. We agree. *State National Bank v. Academia, Inc.*, 802 S.W.2d 282, 298 (Tex.App.—Corpus Christi 1990, writ denied); *Cathey v. First City Bank of Aransas Pass*, 758 S.W.2d 818 (Tex.App.—Corpus Christi 1988, writ denied).

■ The only issue in dispute is whether the appellants had an individual cause of action.

The facts show that the Lindsays and the Titlows were interested in obtaining loans for

their respective corporations. Bryant made a package offer to each couple. He would get them a loan if, (1) they paid an up front brokerage fee to him, and (2) they purchased an insurance policy or annuity. Each of the couples agreed to and accepted Bryant's offer. The primary interest of the Lindsays and Titlows was to obtain a loan. The payment of an up front brokerage fee and the purchase of an insurance policy or annuity was only a means by which they could obtain the loan.

We hold that the trial court properly excluded evidence of mental anguish suffered by the Lindsays and Titlows. Their actions as stockholders were solely to obtain a corporate loan. The loss suffered by the corporations in not obtaining a loan was the corporation's loss; those losses did not give rise to a stockholder's derivative action or a personal action by the Lindsays and Titlows.

Appellants' points of error four through seven are overruled.

### IV.

Appellants' points of error eight and nine complain that the trial court erred in submitting an "out of pocket" damage issue to the jury and in refusing to submit a "benefit of the bargain" issue to the jury which they assert is the proper measure of damages under the facts of this case. Appellants pled common law negligence and violations of the Texas Deceptive Trade Practices Act and The Texas Insurance Code by Met Life.

■■■■■ Under the "out of pocket" measure of damages, a party may recover the difference between *the value given* and the value received. Under the "benefit of the bargain" measure of damages, a party may recover the difference between *the value as represented* and the value as received. *W.O. Bankston Nissan, Inc. v. Walters*, 754 S.W.2d 127, 128 (Tex.1988).

■■■ The Texas Deceptive Trade Practice Act permits a plaintiff to recover either the "out of pocket" or the "benefit of the bargain" damages, whichever is greater. *Id.*

The Texas courts have been flexible in applying the "out of pocket" or "benefit of the bargain" measure of damages. See

*Chrysler Corp. v. McMorries*, 657 S.W.2d 858, 865 (Tex.App.—Amarillo 1983, no writ).

■■■ In resolving appellants' claim, we are faced with several problems. First, appellants have not directed us to any specific issue about which they are complaining. Second, appellants' brief, in some instances, treats the basis for the claims of the individual appellants and the corporation as being synonymous, and they are not. Third, there were eight damage issues requiring twenty-six answers, with some individual issues directed to claims of both individuals and corporations where the measure of damages may have been different for the individuals and corporations.

Appellants' objection to the court's use of "out of pocket" expenses recovery was that it was the wrong measure and that the proper measure was "benefit of the bargain." The court refused appellants' submitted issue. In addition to submitting the refused issues, appellants also suggested to the court that both measures of damages could be used.

The appellants' suggestion that both measures of damage could be used was appropriate; however, it was inadequate as an objection because it did not inform the court of which measure of damages should be used in any specific issue. Furthermore, proper issues were not submitted by appellants. For instance, the Texas Deceptive Trade Practice Act permits a plaintiff to recover either the "out of pocket" or the "benefit of the bargain" damages whichever is greater. *Bankston Nissan*, 754 S.W.2d at 128. As far as we can tell from the record, the appellants did not submit proper instructions on those issues that pertain to their claims under the Deceptive Trade Practice Act.

Appellants have asked that we set out what specific measure of damage should be used by the trial court in the event this case is remanded. This we respectfully decline to do. However, we point out that the cases we have cited herein should give the trial court guidelines to follow on both common law and statutory measure of damages.

We hold that the trial court erred in using the "out of pocket" measure of damages in all

586

damage issues. We further hold that the appellants waived objection to the use of the "out of pocket" measure of damages because their objection lacked the specificity necessary to inform the trial court of the proper method for using the two different measures of damage.

Appellants' points of error eight and nine are overruled.

The judgment of the trial court is affirmed.