GXG, INC., Appellant,

v.

TEXACAL OIL & GAS and Ted
O'Connor, Appellees.

No. 13–96–368–CV.

Court of Appeals of Texas,
Corpus Christi.

June 18, 1998.

Rehearing Overruled Aug. 27, 1998.

**406**

Craig P. Henderson, William L. Wolf, P.C., Michael A. Dover, Dallas, for Appellant.

Robert L. Joseph, Joseph & Whatley, Sinton, for Appellee.

Before SEERDEN, C.J., and HINOJOSA and CHAVEZ, JJ.

## OPINION

HINOJOSA, Justice.

This dispute arose from a conveyance of real and personal property interests. After appellee, Texacal Oil & Gas ("Texacal"), failed to make scheduled payments on a promissory note, appellant, GXG, Inc. ("GXG"), sought to foreclose on the properties. Texacal sued, seeking to block foreclo-

sure on the properties, cancellation of the deed of trust and promissory note, abatement of the purchase price, quieting of title, and damages. GXG counterclaimed against Texacal and instituted a third-party action against appellee, Ted O'Connor ("O'Connor"), Texacal's president. GXG sought damages for Texacal's non-payment of the promissory note, fraud, and civil conspiracy. GXG also asked the trial court to impose a constructive trust and reform the note and deed of trust. A jury found that: (1) GXG did not convey the properties it promised to convey to Texacal, thereby excusing Texacal's performance, (2) Texacal sustained damages, (3) appellees did not commit or conspire to commit fraud on GXG, (4) Texacal owed $13,200 to GXG on the outstanding promissory note, and (5) there was no mistake necessitating reformation of the deed of trust.

The trial court disregarded the jury's findings on the balance due on the promissory note, some of Texacal's damages, and no mistake necessitating reformation of the deed of trust. The trial court rendered judgment in favor of GXG for $81,284.34 for the unpaid promissory note, reformed the deed of trust to include all of the properties conveyed, imposed an implied vendor's lien on all of the properties, and ordered foreclosure on the properties. The trial court ordered that GXG take-nothing against O'Connor.

By thirteen points of error, GXG complains the trial court erred by overruling its motions for judgment *non obstante veredicto* and new trial, by refusing to allow it to present relevant evidence, and by improperly calculating the balance due on the promissory note. By two cross-points, appellees, Texacal and O'Connor, contend the trial court erred in disregarding the jury's findings because there is sufficient legal and factual evidence to support them. We reform and modify the judgment and, as reformed and modified, affirm.

### 1. *Background Facts*

GXG, Inc., a Texas corporation formed in 1988, owned and operated various oil and gas properties in south Texas ("South Texas properties"). The company is owned by

Gwen Knox and her two daughters. Knox is GXG's president. Brad Gatlin was Knox's financial advisor and an officer of GXG.

Besides the GXG properties, Knox also had legal and beneficial ownership interests in other oil and gas properties held in family trusts. She individually held an interest in the Yates Petroleum Company ("Yates properties") in New Mexico and was sole beneficiary of a family trust, the Gwendolyn Knox Schmaling Trust (the "Schmaling Trust"), containing oil and gas interests. She shared an equal beneficiary interest with her brother, Jack Knox, and sister, T.K. Helm, in two other family trusts, the T.B. Knox Trust ("the TBK Trust") and the E.D. Dill Trust ("the Dill Trust"), comprised of several types of property, including stocks and oil and gas interests. In 1991, all of the trusts were terminated and the assets distributed to the beneficiaries. Knox received 100% of the oil and gas properties of the Schmaling Trust. Knox, her brother, and sister each received one-third of the oil and gas properties in the TBK Trust and Dill Trust. Knox's share of the Schmaling, TBK, and Dill Trusts will hereafter be referred to collectively as the "Knox trust properties."

Ted O'Connor was a mortgage broker in Newport Beach, California. Gatlin and O'Connor had been acquainted since 1980, but were not frequently or regularly in touch. In late 1990 or early 1991, Gatlin contacted O'Connor to discuss a business proposition. Gatlin informed O'Connor that he "ran GXG," and that GXG's owners wanted to sell their oil and gas interests. Gatlin told O'Connor that, in addition to the GXG properties, Knox would be receiving oil and gas leases from the settlements of family trusts in 1991, and that these would also be included in the sale. Gatlin and O'Connor agreed that the price of the GXG lands would be $500,000, and the Knox trust properties $550,000. After reaching agreement on the price, O'Connor decided to form a company, Texacal Oil & Gas, Inc., which would acquire both GXG's and Knox's properties. Gatlin became a director, vice-president in charge of managing production, and registered agent of Texacal. Gatlin also became a shareholder with a 20% interest in Texacal. The shares had no par value and Gatlin did not invest any capital in exchange for the shares.

During negotiations for the sale of GXG's properties to Texacal, Gatlin informed Texacal that he was a vice-president of GXG and ran all of the company's operations. He also disclosed his continuing status as Knox's financial advisor. However, Gatlin did not inform Texacal that some of the oil and gas leases and equipment involved in the negotiations were, in fact, his property rather than GXG's or Knox's. Gatlin did not inform GXG or Knox of his status as an officer, director, and registered agent of Texacal.

Prior to the closing of the transaction, Texacal engaged Robert Dougherty to perform a study on the oil and gas reserves of the properties Texacal expected to receive. Dougherty, who had previously performed work for GXG, was designated as Texacal's production superintendent when Texacal was first formed.

On April 9, 1991, GXG agreed to sell Texacal the South Texas properties and Knox's trust interests. The purchase price for all of the properties was $1,050,000. The written, executed agreement provided for Texacal to pay $500,000 in cash and to execute a promissory note for $550,000, secured by a deed of trust which encumbered selected portions, but not all, of the Knox trust and South Texas properties.

At the closing, Texacal received the assignment for the South Texas properties. As Knox did not yet have possession of the Knox trust properties, the note and deed of trust were placed in escrow with Equitable Bank in Dallas, until the balance of the properties was conveyed. Upon notification, in July 1991, that the remaining assignments had been prepared, Texacal authorized Equitable Bank to release the note and deed of trust to GXG.

After receiving the assignment papers, Texacal discovered that only a one-third interest in the Knox trust properties had been conveyed. This discovery led to a falling out between Gatlin and O'Connor, when Gatlin failed to explain why GXG's conveyance was deficient. Gatlin resigned as a director and officer of Texacal and declared his intention

to tender his shares in October 1991. Texacal never paid Gatlin compensation for his services as vice-president or director and the shares had no redeemable value. Because Gatlin never returned the stock certificate, he remained a stockholder until early 1994, when Texacal's board of directors struck the shares off the company's books.

Knox discovered that Gatlin, who had been her personal financial manager since 1987, had misrepresented his qualifications as a financial advisor, committed numerous acts of fraud in managing her personal and business affairs, and had been rifling her bank accounts, including misappropriating the cash paid by Texacal. She sued Gatlin in Dallas, and the case was settled for $500,000. Gatlin is not a party to the instant suit and did not appear as a witness.

### 2. Choice of Law: Texas or California

■ At the trial on the matters before us, GXG elicited from Texacal's witnesses and from O'Connor a significant amount of testimony concerning the provisions and effects of California law on the issues. In its appellate brief, GXG emphasizes portions of this testimony in support of its arguments. Because the contract does not specify which state's law controls, Texas courts must look to the principles enunciated in the Restatement (Second) of Conflict of Laws (1971) to decide which state's law should govern contractual rights and obligations. *Maxus Exploration Co. v. Moran Bros., Inc.*, 817

S.W.2d 50, 53 (Tex.1991). The general rule of section 188 of the Restatement [1] controls our analysis. *See id.; see also DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677–78 (Tex.1990). Under that rule, "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." [2] RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 188(1) (1971).

We conclude this case has only tenuous ties to California. Ted O'Connor is a resident of California. Most, if not all, of Texacal's investors reside in California. However, Texacal is a corporation organized under Texas law, registered and operating in Texas. It has a Texas mailing address, and its registered agent, Henry Harding, is a Texas resident. GXG is also a Texas corporation. Knox is a Texas resident. The bulk of negotiations took place either in Texas or by telephone between Texas and California. Although there is a dispute as to where the contract, note, and deed of trust at issue were drafted, they were executed in Texas, and performance was to take place in Texas. Almost all of the oil and gas properties concerned, with the exception of a field in New Mexico, are located in Texas.

We hold that California law is neither controlling nor guiding in this case. Evidence and arguments based on what would be ap-

---

**1.** Section 188 provides, in relevant part, as follows:

> In the absence of an effective choice of law by the parties …, the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 188(2) (1971).

**2.** Section 6, entitled "Choice–of–Law Principles," provides:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:
 (a) the needs of the interstate and international systems,
 (b) the relevant policies of the forum,
 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
 (d) the protection of justified expectations,
 (e) the basic policies underlying the particular field of law,
 (f) certainty, predictability and uniformity of result, and
 (g) ease in the determination and application of the law to be applied.

*Id.* § 6.

propriate or legal under California law will not be considered.

### 3. *Denial of Motion for Judgment Non Obstante Veredicto*

■ By its first and second points of error, GXG contends the trial court erred in denying its motion for judgment *non obstante veredicto* because its counterclaims and third-party claims were established as a matter of law. A judgment *non obstante veredicto* is proper only if there is no evidence to support the jury's findings and if the issue is conclusively established as a matter of law. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex.1990); *Burns v. Resolution Trust Corp.*, 880 S.W.2d 149, 151 (Tex.App.—Houston [14th Dist.] 1994, no writ); *Crosbyton Seed Co. v. Mechura Farms*, 875 S.W.2d 353, 363 (Tex.App.—Corpus ·Christi 1994, no writ). Usually, in reviewing the denial of such a motion, we use a "no evidence" standard with respect to the jury's findings and view the evidence in the light most favorable to the nonmovant, rejecting unfavorable evidence and inferences. *Crosbyton Seed Co.*, 875 S.W.2d at 363; *see Navarette v. Temple Indep. Sch. Dist.*, 706 S.W.2d 308, 309 (Tex.1986); *Gregorcyk v. Al Hogan Builder, Inc.*, 884 S.W.2d 523, 525 (Tex.App.—Corpus Christi 1994, writ denied); *Kelly v. Diocese of Corpus Christi*, 832 S.W.2d 88, 90 (Tex.App.—Corpus Christi 1992, writ dism'd w.o.j.). In a situation such as this, where the moving party contends that its counterclaims and third-party claims are established as a matter of law, we review the record for evidence which, if believed, negates an element of the counterclaim or establishes the complete absence of proof of an element. If there is some probative evidence supporting the verdict, we must affirm the trial court's denial of the motion. *Crosbyton Seed Co.*, 875 S.W.2d at 363.

GXG contends it was entitled to judgment *non obstante veredicto* because it proved Texacal committed fraud upon GXG, and O'Connor committed or conspired with Gatlin to commit fraud upon GXG.

The questions submitted to the jury asked simply, "Did Texacal Oil & Gas, Inc. commit fraud against GXG, Inc.?" and "Did Ted O'Connor commit fraud or conspire to commit fraud with Brad Gatlin against GXG, Inc.?" The jury was given several definitions of fraud. One definition covered a situation where a party knowingly misrepresented a past or existing material fact or recklessly made a positive assertion without any knowledge of the truth with the intention of inducing reliance which resulted in damage to the other party. *DeSantis*, 793 S.W.2d at 688; *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 185 (Tex.1977); *Garner v. Corpus Christi Nat. Bank*, 944 S.W.2d 469, 477 (Tex.App.—Corpus Christi 1997, writ denied). Another definition encompassed a situation where a party conceals or fails to disclose a material fact with the intent to induce another party to take some action, and the party knows the relying party is both ignorant of the concealed fact and lacks an equal opportunity to discover the truth. *Formosa Plastics Corp., USA v. Presidio Eng'rs & Contractors, Inc.*, 941 S.W.2d 138, 144 (Tex.App.—Corpus Christi 1995), *rev'd on other grounds*, 960 S.W.2d 41 (Tex.1998); *New Process Steel Corp. v. Steel Corp.*, 703 S.W.2d 209, 214 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.); *see also Custom Leasing, Inc. v. Texas Bank & Trust Co.*, 516 S.W.2d 138, 142 (Tex.1974). The jury charge also defined fraud as falsely promising to act without intention of keeping the promise in order to induce a party relying on the promise to enter into a contract. TEX. BUS. & COM.CODE ANN. § 27.01(a) (Vernon 1987) (fraudulent misrepresentations made in real estate and stock transactions). The definitions were identical for each question. No instructions or definitions concerning the relationship between principal and agent were provided. The jury found that neither Texacal nor O'Connor committed fraud.

GXG alleged Gatlin acted as a dual agent, and Texacal and O'Connor fraudulently concealed the dual agency and Gatlin's interest in Texacal as a shareholder, director, officer, and registered agent. In this case, Gatlin was expressly authorized to act as an agent for GXG. Texacal never denied GXG's assertions that Gatlin was its agent as well. There is no dispute that Gatlin made misrep-

resentations and failed to disclose information to GXG. GXG claims that it has the right to recover from Texacal and O'Connor for those misrepresentations.

 Double agency normally requires the fully informed consent of both principals. *Armstrong v. O'Brien*, 83 Tex. 635, 19 S.W. 268, 274 (1892); *Grundmeyer v. McFadin*, 537 S.W.2d 764, 772 (Tex.Civ.App.—Tyler 1976, writ ref'd n.r.e.). However, a principal may not generally recover from another on the basis of a misrepresentation made to him by his own agent. *Traylor v. Gray*, 547 S.W.2d 644, 651 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.); *Kunkel v. Poe Land & Devel. Co.*, 393 S.W.2d 191, 196 (Tex.Civ.App.—Corpus Christi 1965, no writ). One principal of a dual agent may be liable to the other principal for the tortious acts of the dual agent only if he or she is in some manner directly connected with the agent's wrongdoing. *See Rich v. McMullan*, 506 S.W.2d 745, 749 (Tex.Civ.App.—San Antonio 1974, writ ref'd n.r.e.); *see also United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada v. Borden*, 160 Tex. 203, 328 S.W.2d 739, 744 (1959). A third person who knowingly participates in an agent's breach of his duty of a fiduciary, becomes a joint tortfeasor and is equally liable with the agent. *See Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 514 (1942). Based on these precedents, we conclude that knowledge of a dual agent's fraudulent conduct towards one principal is not automatically imputed to the other principal. The evidence must demonstrate an affirmative link, not mere suspicion.

A review of the record reveals no evidence of any misrepresentations or omissions chargeable to Texacal or O'Connor. Knox recited numerous acts of fraud perpetrated by Gatlin as her financial advisor. Lengthy tape-recorded conversations between Knox and Gatlin were played for the jury. In talking with Knox, Gatlin never once implicated Texacal or O'Connor in any of his

activities. Tape-recorded conversations with O'Connor likewise reveal no knowledge of or participation in any misrepresentations made by Gatlin. On the contrary, they reveal that Gatlin made material misrepresentations to O'Connor.[3]

Knox repeatedly admitted having no knowledge whatsoever of any involvement on the part of Texacal or O'Connor in Gatlin's shenanigans. She was unable to cite even one instance of wrongdoing by O'Connor or Texacal. GXG presented no evidence showing that Texacal or O'Connor were aware of or encouraged any of Gatlin's misrepresentations or failures to make disclosures. Knox simply maintained that because O'Connor and Gatlin were associated, O'Connor must have known of and participated in Gatlin's schemes.

Knox acknowledged that Texacal and O'Connor had not prevented her or GXG from having legal counsel draft or approve any of the documents or represent her at the closing. O'Connor testified that the contract, promissory note, and deed of trust had been drafted by Knox's attorneys in Dallas then forwarded to him for review. Knox could not say who prepared them, only that she believed it had been done in California by Texacal's lawyers.

Knox further admitted that she trusted Gatlin to handle all negotiations for GXG and figure out a good price for the properties. Although she saw the contract and possibly other papers before the closing, she did not bother to read them thoroughly or ask many questions about them. Knox never testified that Gatlin prevented her from reading the contract, the note, or the deed of trust. As a rule, she said, she signed documents presented by Gatlin without reading them and, thus, could not testify as to the contents. Knox was present at the closing and signed the documents but admittedly did not take time to read them.

---

3. Excerpts from several telephone conversations between Ted O'Connor and Gwen Knox, tape recorded by Knox without O'Connor's knowledge, contain statements and queries by O'Connor concerning Brad Gatlin's misrepresentations to O'Connor. In one conversation, O'Connor and Knox are apparently discussing assembling evidence of Gatlin's frauds upon both parties for presentation to the District Attorney.

We have previously held that a party who signs a contract is charged with notice of its contents as a matter of law. *D. Wilson Const. Co., Inc. v. McAllen Indep. Sch. Dist.*, 848 S.W.2d 226, 229–30 (Tex.App.—Corpus Christi 1992, writ dism'd w.o.j.); *Estate of Degley v. Vega*, 797 S.W.2d 299, 304 (Tex. App.—Corpus Christi 1990, no writ); *see also G–W–L, Inc. v. Robichaux*, 643 S.W.2d 392, 393 (Tex.1982) (parties to a contract have an obligation to protect themselves by reading what they sign), *overruled on other grounds, Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349 (Tex.1987); *Thigpen v. Locke*, 363 S.W.2d 247, 254 (Tex.1962).

GXG points to the disclosure paragraph in the contract as the fundamental evidence of fraud. GXG claims this proves it had no knowledge of the agency or Gatlin's conflict of interests and, "as a matter of law [proved] that Knox relied upon Texacal's and O'Connor's representations as to Gatlin's relationship with Texacal." Paragraph V(A)(3) of the contract states as follows:

Buyer and Seller hereby acknowledge a pre-existing relationship by and between the President of GXG, Inc. (Gwen Knox), the President of Texacal Oil & Gas, Inc. (Ted O'Connor), and Brad Gatlin. Buyer and Seller agree that the purchase of mineral interest contemplated herein is for the mutual benefits of each corporation. Buyer and Seller acknowledge no commissions or finders' fee, or any cash settlement has been or will be incurred for Brad Gatlin. Buyer and Seller shall hereby defend, indemnify, save and hold harmless Brad Gatlin for the transactions contemplated herein, past, present and future. Seller further acknowledges its understanding of Buyer's intent to employ Brad Gatlin in connection with the management and/or operation of all, or a portion of the lease interests conveyed hereunder and expressly waives any and all claim(s) Seller may have as against Buyer or Brad Gatlin in any way connected with such employment.

The paragraph does not detail the nature and the extent of the relationships between the people and entities named. GXG complains that it fails to mention Gatlin's status as officer, director, registered agent, and shareholder of Texacal and further fails to disclose that Gatlin acted as a dual agent. We note that it likewise fails to mention Gatlin's status as an officer of GXG and as Knox's financial advisor. Knox's testimony does not reflect that she informed Texacal or O'Connor of Gatlin's status or knew whether Gatlin had made such disclosures.

Knox admitted seeing the disclosure paragraph before the closing. The paragraph clearly reveals that Gatlin had accepted an offer of employment with Texacal, impliedly contingent on the successful closing of the deal. This produces an obvious conflict of interest on the part of Gatlin, GXG's agent. Despite knowing of the conflict of interest, GXG did not terminate the agency and failed to oversee or review Gatlin's actions, disregarding the temptation of self-interest and opportunity for disloyalty.

Dennis Delahanty, a California attorney who was present at the closing, recalled a discussion in Knox's presence about Gatlin's interests in Texacal, including ownership and management interests. Although Delahanty could not remember the specifics, he stated unequivocally that no attempt was made to keep the information from Knox. Knox, on the other hand, insisted she had no knowledge of Gatlin's interests. No other witnesses testified about what was discussed concerning Gatlin at the closing.

As the trier of fact, the jury is the sole judge of the credibility of witnesses and the weight to be given their testimony. *L & F Distrib. v. Cruz*, 941 S.W.2d 274, 281 (Tex. App.—Corpus Christi 1996, writ denied); *Silva v. Enz*, 853 S.W.2d 815, 817 (Tex. App.—Corpus Christi 1993, writ denied). In resolving contradictions and conflicts, the jury may choose to believe all, part, or none of the testimony of any witness in arriving at the finding which it concludes is the most reasonable under the evidence. *L & F Distrib.*, 941 S.W.2d at 281; *Silva*, 853 S.W.2d at 817. The jury reasonably may have chosen to believe Knox learned of Gatlin's interests from the conversation among those present at the closing.

■ Knox certainly knew that Gatlin had an ownership interest in Texacal sometime

before June 1992.[4] She also knew that some of the properties included in the conveyance to Texacal belonged to Gatlin rather than herself or GXG. Despite this knowledge, she accepted a payment directly from Texacal in May 1992, and from January to July 1993, accepted payments from Mesa Oil, which were assigned to GXG by Texacal. By continuing to accept funds after learning of her former agent's interest in Texacal, and the properties Texacal acquired, GXG, as a matter of law, affirmed the contract and waived any recovery under a theory of fraud. *Daniel v. Goesl*, 161 Tex. 490, 341 S.W.2d 892, 895 (Tex.1960) (party who became aware of fraudulent inducement after entering into contract but received and accepted benefits in spite of knowledge acquired, thereby affirmed contract and was bound by its terms); *Wise v. Pena*, 552 S.W.2d 196, 200 (Tex.Civ. App.—Corpus Christi 1977, writ dism'd w.o.j.) (if defrauded party ratifies agreement, any right of recission or damages is waived); *see Rosenbaum v. Texas Bldg. & Mortgage Co.*, 140 Tex. 325, 167 S.W.2d 506, 508 (1943); *Newsom v. Starkey*, 541 S.W.2d 468, 472 (Tex.Civ.App.—Dallas, writ ref'd n.r.e.) (acceptance of payments after learning agent was a principal resulted in waiver).

■ GXG also contends that O'Connor conspired with Gatlin to defraud GXG. The jury was not instructed on the elements of conspiracy to commit fraud. When a party does not submit to the trial court requested definitions and instructions in substantially correct form, the party waives error. *Downen v. Texas Gulf Shrimp Co.*, 846 S.W.2d 506, 508 (Tex.App.—Corpus Christi 1993, writ denied); *National Fire Ins. Co. v. Valero Energy Corp.*, 777 S.W.2d 501, 507–08 (Tex.App.—Corpus Christi 1989, writ denied); *see* Tex.R. Civ. P. 274. GXG raised no objections to the submission of the question despite the omission, thereby waiving the error. *See* Tex.R. Civ. P. 273, 274, 278; *see also Russell v. City of Bryan*, 919 S.W.2d 698, 707 (Tex.App.—Houston [14th Dist.] 1996, writ denied).

After reviewing the record, we conclude there is ample evidence to support the jury's finding that neither Texacal nor O'Connor committed fraud. We hold the trial court properly denied GXG's motion for judgment *non obstante veredicto*. Accordingly, GXG's first and second points of error are overruled.

### 4. *Denial of Motion for New Trial*

■ By its third and fourth points of error, GXG contends the trial court erred in overruling its motion for new trial because the jury's findings that Texacal did not commit fraud upon GXG and that O'Connor did not commit or conspire to commit fraud upon GXG were against the great weight and preponderance of the evidence.

A trial court has broad discretion to deny a motion for new trial, and this denial will not be disturbed on appeal absent an abuse of that discretion. *Strackbein v. Prewitt*, 671 S.W.2d 37, 38 (Tex.1984); *Moya v. Lozano*, 921 S.W.2d 296, 298 (Tex.App.—Corpus Christi 1996, no writ). An appellate court may reverse a trial court for abuse of discretion only if, after searching the record, it is clear that the trial court's decision was arbitrary and unreasonable. *Simon v. York Crane & Rigging Co.*, 739 S.W.2d 793, 795 (Tex.1987); *Brown v. Hopkins*, 921 S.W.2d 306, 311 (Tex.App.—Corpus Christi 1996, no writ).

GXG's arguments do not focus on the trial court's exercise of its discretion, instead they focus on the factual sufficiency of the evidence. When a party with the burden of proof attacks the factual sufficiency of a jury finding, his point of error on appeal should be that the jury finding is "against the great weight and preponderance of the evidence," instead of complaining that the trial court erred in not granting a motion for new trial. See *Heard v. Roos*, 885 S.W.2d 592, 594 (Tex.App.—Corpus Christi 1994); *Lopez v. Salazar*, 878 S.W.2d 662, 662–63 (Tex.App.—Corpus Christi 1994, no writ). When we review a point of error that a jury finding is against the great weight and preponderance

---

4. In a tape-recorded conversation with Ted O'Connor on June 3, 1992, Gwen Knox brings up the subject of Gatlin's interest in Texacal. The precise date she acquired this knowledge is unknown.

of the evidence, we examine the entire record and set aside the verdict only if it is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex.1985); *Hickey v. Couchman*, 797 S.W.2d 103, 110 (Tex.App.—Corpus Christi 1990, writ denied).

After reviewing the evidence in addition to that discussed under points one and two above, it is patently clear that the jury's findings against GXG's counterclaims of fraud are not against the great weight and preponderance of the evidence.

When he first approached O'Connor, Gatlin told him one of the reasons GXG and Knox wished to sell their oil and gas interests was to raise cash to meet a million dollar tax liability. Gatlin represented that the $1,050,000 asking price was low because of the urgent need to raise money. Gatlin suggested to O'Connor that some attorneys, possibly Knox's own attorneys, had expressed interest in buying the property at a price of $1.5 million, cash. The evidence of Knox's awareness of the alleged cash offer is conflicting. According to Delahanty, Knox was present when Gatlin repeated the representation at the closing.

Knox contends the story of the tax liability is false. Knox admits learning of the purported $1.5 million cash offer at some unspecified time, but asserts that Texacal's interest in closing the deal for $1,050,000 was intended to take advantage of her ignorance of the counter-offer. We find no evidence in the record that a $1.5 million cash offer was actually made by another party at any time.

It is unclear who drafted the contract, promissory note, and deed of trust. O'Connor testified that Gatlin had obtained the documents from Knox's attorneys in Dallas. O'Connor's California attorney, William Bissell, added disclosure language, although it is uncertain whether Bissell's addition to the draft was reflected verbatim in the final contract. Knox contended O'Connor's attorneys in California had prepared the documents. There is no positive evidence from which we can determine who drafted the contract, note, or deed of trust.

GXG complains the parties agreed that Gatlin would not receive a "finder's fee" for arranging the transaction. Later, when Knox discovered Gatlin's 20% interest in Texacal, O'Connor explained that it was "like a finder's fee," and that Gatlin had demanded it as part of his compensation for managing Texacal's properties in Texas. Even if we were to assume that Gatlin's interest in Texacal was a finder's fee, we find no evidence in the record that GXG relied on the statement (that no finder's fee would be involved) or that the statement had any effect on GXG's decision to enter into the contract. The record reflects that Gatlin never received any pecuniary compensation from Texacal for his services, in the form of a finder's fee or anything else.

GXG contends the promissory note contains a "bizarre term" which, in essence, resulted in some of Knox's own funds being used to pay the note. The promissory note required Texacal to perform legal work necessary to clear a title problem on the Yates properties conveyed to it by GXG. The income generated prior to the conveyance was to be held in suspense until the title was cleared, at which time the funds would be released to Knox and then applied to Texacal's note. Although the term may be atypical, there is no evidence as to how or why it came to be included in the promissory note. GXG does not contend it had no opportunity to review the note's terms before the closing. Nearly two years after receiving the Yates property, Texacal succeeded in clearing the title as agreed.

The same is true of the deed of trust, which encumbers some but not all of the properties conveyed to Texacal. GXG was not prevented from examining the deed of trust before the closing. In fact, the evidence suggests that Knox did review it. We note that the list of the Knox trust properties to be conveyed, names without descriptions, fills almost two pages; and that the descriptions of the properties encumbered by the deed of trust is also only two pages long. A cursory glance would have revealed the fact that only certain properties were encum-

bered by the deed of trust. O'Connor testified that the properties covered by the deed of trust were all valuable, producing properties, while those excluded were non-producing or otherwise undesirable properties. Knox did not refute this contention, except to state that she had expected all of the properties conveyed to be encumbered, including those sold outright for cash.

GXG argued that Texacal and O'Connor failed to exercise due diligence in approaching the transaction as they did not request title work be done on the properties to be conveyed nor retain Texas counsel to represent them in negotiating and drafting of documents. Pointing to O'Connor's experience in California real estate transactions and knowledge of California real estate law, GXG contends Texacal's less than meticulous approach to the deal with GXG is evidence it actively participated in the fraud perpetrated by Gatlin. O'Connor freely admitted he had no experience in oil and gas properties and no knowledge of Texas oil and gas law. He relied totally on Gatlin, whom he believed to be highly experienced and knowledgeable, to advise him and to handle the necessary investigations and preparations. GXG acknowledges that O'Connor "trusted" Gatlin to do right by him, just as GXG likewise trusted Gatlin. The misplacement of trust and reluctance to attempt its own investigation may reflect poorly on Texacal's business acumen, but it is not *per se* indicative of fraud. As for Texacal's failure to retain Texas counsel, GXG emphasized that O'Connor is a Californian. O'Connor testified that, in California, lawyers are not routinely engaged for property transactions.

During negotiations, O'Connor contacted a woman he believed was Knox and asked her to authorize the release of information concerning the cash flows on some of the properties to be included in the sale. Although Knox denied ever speaking with O'Connor before the closing, Knox tape recorded a telephone conversation she had with O'Connor concerning the cash flows sometime after the closing. The conversation suggests Knox

may have had knowledge of O'Connor's pre-sale request for cash flow information.

It appears both parties trusted Gatlin to make fair disclosures. Gatlin informed Knox prior to the closing that some oil and gas interests and equipment owned by persons other than Knox and GXG, including property Gatlin owned, would be included in the sale to Texacal.[5] Texacal did not learn of this until just before closing; the revelation was not made by Knox or GXG.

After the sale to Texacal closed, Knox sued Gatlin for fraud, misappropriation of funds, and breach of fiduciary duty. The case was settled for $500,000. The action against Gatlin produced literally rooms full of evidence. Despite this extensive discovery, Knox acknowledged there was no evidence linking Texacal or O'Connor to Gatlin's misconduct. Knox nonetheless insisted that she knew, "he and [Gatlin] were orchestrating the entire transaction," and "I assume [fraud]" because O'Connor and Gatlin worked together and "all the things in drawing up the Texacal transaction was very much for them, not for me." A motion for new trial cannot rest on a subjective presumption of "guilt by association." Moreover, the contract provided for Knox to receive $1.05 million for properties actually worth less.

Finally, GXG urges "the most telling aspect of the fraud upon GXG" is that Texacal has not attempted to rescind the contract and "is obviously happy with what they received." However, the record reflects Texacal brought this action against GXG, accusing GXG of deficiencies in the conveyance and seeking abatement of the purchase price, cancellation of the note and deed of trust, quieting of title, and damages for breach of contract.

After reviewing the record, we find no evidence of fraudulent conduct by either Texacal or O'Connor. We hold the trial court did not abuse its discretion in denying GXG's motion for new trial. GXG's third and fourth points of error are overruled.

**5.** Knox's testimony is inconsistent as to when she acquired this knowledge and the extent of her knowledge. It is reasonably clear, however, she knew prior to closing that interests other than those owned by Knox or GXG were to be included in the sale to Texacal.

### 5. Estoppel of Texacal's Breach of Contract Claims

By its fifth, sixth, and seventh points of error, GXG contends that Texacal is estopped as a matter of law from asserting a breach of contract offset claim and that GXG is excused from its failure to comply with the sale and purchase contract because Texacal engaged in wrongful conduct and collusion with GXG's agent and is, thus, estopped from asserting any breach of contract claim against GXG.

Because we have concluded the jury correctly determined that neither Texacal nor O'Connor committed fraud, and that they were not participants in any fraud perpetrated by Gatlin, we overrule GXG's fifth, sixth, and seventh points of error.

### 6. Doctrine of Merger

■ By its eighth point of error, GXG complains the trial court erred in denying its motion for judgment *non obstante veredicto* on GXG's note claims because Texacal's breach of contract claim is barred as a matter of law by the doctrine of merger by deed. Although Texacal contends this theory was not pleaded by GXG, we find that it is clearly included as an affirmative defense in GXG's third amended answer and counterclaim.

■ The merger doctrine is an analogue of the parol evidence rule and functions to prevent enforcement of prior or contemporaneous transactions on the assumption that all agreements merged into the final executed contract. *Hallmark v. Port/Cooper–T. Smith Stevedoring Co.*, 907 S.W.2d 586, 590 (Tex.App.—Corpus Christi 1995, no writ); *Watkins v. Hammerman & Gainer*, 814 S.W.2d 867, 870 (Tex.App.—Austin 1991, no writ). The doctrine of merger by deed operates to merge all prior transactions between the parties into the deed. *Turberville v. Upper Valley Farms, Inc.*, 616 S.W.2d 676, 678 (Tex.Civ.App.—Corpus Christi 1981, no writ). Although a review of the denial of a motion for judgment *non obstante veredicto* usually requires a "no evidence" standard with respect to the jury's findings and a review of the evidence in the light most favorable to the nonmovant, *Crosbyton Seed*

*Co.*, 875 S.W.2d at 363, the applicability of the doctrine of merger is a question of law because it is the court, not the jury, that interprets an unambiguous deed. *French v. Chevron U.S.A. Inc.*, 896 S.W.2d 795, 796 (Tex.1995); *State v. Brazos River Harbor Nav. Dist.*, 831 S.W.2d 539, 542 (Tex.App.—Corpus Christi 1992, writ denied). It is also for the trial court to determine if the agreement at issue is free of ambiguity. *See Sage Street Assoc. v. Northdale Const. Co.*, 863 S.W.2d 438, 445 (Tex.1993) (even if neither party pleads ambiguity, a trial judge may conclude a contract is ambiguous). If an agreement is ambiguous, extrinsic evidence becomes admissible to clarify its meaning. *Kauffman v. Deignan*, 227 S.W.2d 271, 275 (Tex.Civ.App.—Galveston 1949, writ ref'd n.r.e.).

Evidently the trial court found the deed to be ambiguous. *Sage Street Assoc.*, 863 S.W.2d at 445 (despite absence of pleading, court may conclude an ambiguity is present and allow submission of the issue to the jury); *Neece v. A.A.A. Realty Co.*, 159 Tex. 403, 322 S.W.2d 597, 599 (1959) (by submitting issues to the jury designed to ascertain the parties' agreement, "the trial judge evidently considered that the written instrument was ambiguous."). Since no findings of fact or conclusions of law were filed, the judgment of the trial court must be affirmed if it can be upheld on any legal theory that finds support in the evidence. *Zac Smith & Co. v. Otis Elevator Co.*, 734 S.W.2d 662, 666 (Tex.1987); *Commercial Union Ins. Co. v. La Villa Indep. Sch. Dist.*, 779 S.W.2d 102, 104 (Tex.App.—Corpus Christi 1989, no writ); *Turberville*, 616 S.W.2d at 678. This Court's duty is to presume that every fact issue supported by the evidence was resolved in the appellee's favor. *Turberville*, 616 S.W.2d at 678; *Plata v. Guzman*, 571 S.W.2d 408, 410 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.).

The assignment of the properties conveyed to Texacal by GXG, executed by Knox on June 1, 1991, states, in relevant part, as follows:

> GXG ... does GRANT, SELL, CONVEY, TRANSFER, and ASSIGN unto TEXACAL OIL AND GAS, INC .... all of the

interest conveyed to Assignor's [GXG's] predecessor in title, Gwendolyn Knox, et al., from the T.B. Knox Trust to Gwendolyn Knox, et al., and including but not limited to an undivided one third (1/3) interest in and to the leases, lands, property and interests described in the attached Exhibit "A".

All of the T.B. Knox trust properties are included in Exhibit "A."

Looking within the four corners of the deed does not clarify the meaning of the phrase "including but not limited to" as placed in the assignment. On the attachments, the phrase precedes the description of the interests and is coupled with a cite to a referencing document that supplements the description,[6] leading to the reasonable construction that the phrase "including but not limited to" means the equivalent of "more or less." This covers errors in calculations, be they large or small. Such errors are determinable by examining the referenced documents. However, if we apply the interpretation of "more or less" to the assignment, then examine the referenced documents, we are unable to determine the limits of "more or less." Although the assignment recites that conveyance is made to Gwen Knox "and others," there is no other language in the assignment or in any of the attached pages to suggest that any other parties have claims to the interests conveyed, much less identify such persons. "More" could then be interpreted to mean as much as 100%. "Less" could be interpreted as low as 0%. We cannot discern the limits from the four corners of the assignment or the attachments.

Moreover, the clauses conflict. The first clause conveys "all" of the interests in the T.B. Knox Trust to Texacal, whereas the second purports to convey only a one-third interest in the properties described in the attachments which include descriptions of the T.B. Knox trust properties. If we harmonize the two clauses, the placement of the phrase "including but not limited to" could be interpreted as meaning a three-thirds conveyance

is contemplated with a one-third conveyance presently achieved.

Because the phrase "including but not limited to" as used is indefinite and results in more than one interpretation, it is ambiguous. *See Brown v. Havard,* 593 S.W.2d 939, 941–42 (Tex.1980) (explaining test for ambiguity).

■ Although the few cases discussing the doctrine of merger by deed mention that the doctrine is subject to avoidance when there is an allegation and proof of fraud or mistake in the execution of the deed, *Turberville,* 616 S.W.2d at 678; *Forister v. Coleman,* 418 S.W.2d 550, 563 (Tex.Civ.App.— Austin 1967), *writ ref'd n.r.e.,* 431 S.W.2d 2 (Tex.1968), a written deed is a type of contract. *Orbeck v. Alfei,* 276 S.W. 947, 947 (Tex.Civ.App.—Waco 1925, no writ). The doctrine of merger is inapplicable where there is an allegation of fraud, mistake, or accident, or an ambiguity in the contract. *Swanson v. Schlumberger Tech. Corp.,* 895 S.W.2d 719, 729 (Tex.App.—Texarkana 1994, writ granted) (citing *Commercial Bank, Unincorporated, of Mason, Tex. v. Satterwhite,* 413 S.W.2d 905, 909 (Tex.1967)); *Kauffman,* 227 S.W.2d at 275 (principles of law permit referral to agreement upon which deed is founded to explain an ambiguity in deed); *see Boy Scouts of Am. v. Responsive Terminal Sys., Inc.,* 790 S.W.2d 738, 745 (Tex. App.—Dallas 1990, writ denied) (in absence of fraud, mistake, accident, or ambiguity, presumption is that all prior agreements merged in final written instrument); *Davis v. Andrews,* 361 S.W.2d 419, 423 (Tex.Civ. App.—Dallas 1962, writ ref'd n.r.e.) (in absence of ambiguity, deed is enforced as written).

Because the doctrine of merger is not applicable, we hold the trial court did not err in denying GXG's motion for judgment *non obstante veredicto* on this ground. Appellant's eighth point of error is overruled.

---

**6.** The following excerpt from a deed for property in Lea County, New Mexico illustrates its usage: "including but not limited to a .0019530 royalty interest in the Lee Lease/Well/Unit as described

in Warren Petroleum Company Division Order No. 6110 in property nos. W161000455, W161000020 dated February 7, 1969 credited to Assignor under owner no. W179467150."

### 7. Factually Sufficient Evidence of Interest Conveyed

■ The jury found that the agreement between the parties was for the conveyance of a three-thirds interest in the Knox trust properties, not the one-third interest actually conveyed. The jury also found that the difference between the value of the properties contracted for and the value of the properties actually received was $330,000. The trial court accepted the jury's findings and adjusted the initial balance of the promissory note from $550,000 to $220,000, then used the $220,000 as its starting point in reaching its judgment award for GXG of $81,284.34.

By its ninth point of error, GXG contends the trial court erred in overruling its motion for new trial because the jury's finding that GXG agreed to convey three-thirds of the trust properties to Texacal was not supported by factually sufficient evidence.

The grantor's intent is a question of fact, thus a question for the jury. *Viscardi v. Pajestka,* 576 S.W.2d 16, 19 (Tex.1978). Because of the ambiguity in the deed, the jury could look to the Purchase and Sale Agreement to determine the parties' intentions as to the assignment. *Kauffman,* 227 S.W.2d at 275. The Purchase and Sale Agreement contains an integration clause and is not ambiguous. Therefore, parol evidence regarding its terms could be properly disregarded. *Texarkana & Ft. S. Ry. Co. v. Brass,* 260 S.W. 828, 830 (Tex. Comm'n App.1924, judgm't adopted) (inadmissible parol evidence, objected to or not, is "without probative force and will not support any finding"); *Smith v. Smith,* 794 S.W.2d 823, 828 (Tex.App.—Dallas 1990, no writ) (an integration clause is in essence the merger doctrine memorialized); *see also Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981) (effect should be given parties' intention as expressed or apparent in the writing); *Trinity Universal Ins. Co. v. Ponsford Brothers,* 423 S.W.2d 571, 575 (Tex. 1968).

The Purchase and Sale Agreement states, in relevant part, as follows:[7]

### I. PURCHASE AND SALE

Seller agrees to sell and convey and Buyer agrees to purchase and pay for all oil and gas properties more particularly described in Exhibit A and B, subject to the terms and conditions set forth herein, including the following:

(A) All right, title and interest of Seller as disclosed by Seller to Buyer in, to and under all agreements, product purchase, and sale contracts, leases, permits, rights-of-way, easements, licenses, options and orders in any way relating thereto.

(B) Identical undivided interest in and to all of the personal property, fixtures and improvements on the Land, appurtenant thereto or used or obtained in connection therewith or with the production, treatment, sale or disposal of hydrocarbons or water produced therefrom or attributable thereto and all other appurtenances belonging thereto.

(C) As indicated above, this sale includes all personal property, fixtures, and improvements ("Personal Property"). All personal property is to be sold on an "as is" and "where is" basis with all faults, if any and title to which shall be transferred to Buyer by Seller free and clear of any and all liens, claims or liability.

(D) Also conveyed by Seller is all right, title and interest in and to the entire estate created by leases, licenses, permits and other agreements. All mineral interest, working interest, overriding royalties and production equipment are conveyed with Special Warranty, in through and to Buyer. Seller shall furnish to Buyer for Buyer's inspection and approval prior to the close hereof all agreements, oil production contracts, product purchase and sale contracts, permits, licenses, options or orders in any way pertaining to the leases to be conveyed hereunder.

\* \* \* \* \* \*

### III. REPRESENTATIONS AND WARRANTIES

(A) *Representations and Warranties of Seller.* Seller represents and warrants to Buyer as follows:. . . .

---

7. All mistakes of spelling and grammar are in the original.

* * * * * * *

(6) All interests to be conveyed hereunder are free and clear of any claim, priority, lien, assessment, or secured interest and Seller shall provide Buyer at Seller's own cost, at or before the closing hereof, assignment of such clear title. . . .

* * * * * * *

(9) Seller warrants it has contractual agreement to purchase all Knox Trust Working Interest, Royalty Interest, Net Revenue Interest and Production Equipment as evidence by Exhibit "A". Seller shall and hereby agrees to apply all net income accruing, commencing April 1, 1991, attributable to the properties listed as Exhibit "A" to principal and interest due under the note refered [above].

## IV. CLOSING

* * * * * * *

(4) Seller shall deliver to Buyer exclusive possession of the interests.

(5) Seller shall deliver to Buyer all files and records relating to the interests including all agreements, oil production contracts, product purchase and sale contracts, permits, licenses, options or orders relating to the interests.

The contract is short, less than seven pages, and contains no fine print. The first page sets out that "[a]ll right, title and interest of Seller as disclosed by Seller to Buyer" is to be conveyed. Because no fractions are mentioned anywhere in the agreement, "all" is given its ordinary meaning. *Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996); *Garner*, 944 S.W.2d at 475; see CAMBRIDGE INT'L DICTIONARY OF ENGLISH 33 (defining pronoun form of "all" as "the complete amount or number (of), or the whole (of)"). No other beneficiaries of the Knox trust or persons with interests in the property, other than Gwen Knox or GXG, are identified or alluded to. No clause reserves any portion of the properties being conveyed. The attached exhibits, listing and describing the properties contained in the Knox trust properties, disclose fractional interests in

working interests, net revenue interests, royalty interests, and overriding royalty interests, but reveal no fractional interests in the leases, lands, or properties, nor do they mention other trust beneficiaries. The language of paragraph III, section (A)(9) suggests that GXG actually had less than a 100% interest to convey on the date of signing but encompasses a promise to after-acquire the remaining interests in the property and apply all accrued income from the properties to Buyer's obligation in the meantime. When considered in light of this paragraph's promise, the interpretation of the assignment as intending a present one-third conveyance, with a future conveyance anticipated, becomes more apparent. The Purchase and Sale Agreement was executed April 9, 1991.

On June 1, 1991, and again on July 3, 1991, Knox, as GXG President, executed an Assignment of Oil, Gas, and Mineral Leases, Royalties and Overriding Royalties, and Bill of Sale. The ambiguity in the language of the assignments has been discussed under point eight. The property descriptions attached to the assignments describe the properties that are on the list attached to the Purchase and Sale Agreement as Exhibit "A."

The proper construction of the deed was a matter for the jury to decide, due to the ambiguity. *El Paso Land Improvement Co. v. Crawford*, 292 S.W. 518, 520 (Tex. Comm'n App.1927, holding approved) (citing *Kingston v. Pickins*, 46 Tex. 99, 101 (1876) and *Camley v. Stanfield*, 10 Tex. 546, 550 (1853)); *Capps v. Terry*, 75 Tex. 391, 13 S.W. 52, 56 (1889); *Linney v. Wood*, 66 Tex. 22, 17 S.W. 244, 245 (1886); see *Havard*, 593 S.W.2d at 940 & 942 (approving court of appeals' affirmation of jury's findings on ambiguous deed); *Humble Oil & Ref. Co. v. Fantham*, 268 S.W.2d 239, 241 (Tex.Civ.App.—Galveston 1954, writ dism'd w.o.j.) (intention of grantor in ambiguous deed decided by jury). The jury's finding can be set aside only if it is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain*, 709 S.W.2d at 176; *University Prep. Sch. v. Huitt*, 941 S.W.2d 177, 180 (Tex.App.—Corpus Christi 1996, writ denied).

The record supports the jury's conclusion that GXG promised, then failed, to convey a

three-thirds interest in the Knox trust properties. The ambiguity centers on the question of whether the deed was final, conveying only a one-third interest, or a partial conveyance pending the grantor's purchase of the remaining interests. If there is ambiguity in the deed, the construction most favorable to the grantee is to be adopted. *Rettig v. Houston West End Realty Co.*, 254 S.W. 765, 768 (Tex.Comm'n App.1923, judgm't adopted); *Cartwright v. Trueblood*, 90 Tex. 535, 39 S.W. 930, 931 (1897); *see also Bumpass v. Bond*, 131 Tex. 266, 114 S.W.2d 1172, 1174 (1938) (if there is doubt about the parties' intention, due to the language of the deed, such doubt should be resolved against the grantor); *Farmers Canal Co. v. Potthast*, 587 S.W.2d 805, 808 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.).

The jury's resolution of the ambiguity by finding that GXG and Texacal intended to convey a three-thirds interest from GXG to Texacal is firmly supported by the terms of the contract which can be construed in a way that does not clash with the deed. We, therefore, overrule GXG's ninth point of error.

### 8. *Legal and Factual Sufficiency to Support Damages on Property Value*

By its tenth and eleventh points of error, GXG contends the jury's finding that Texacal was damaged in the amount of $330,000 is not supported by legally or factually sufficient evidence.

When we review a "no evidence" or legal sufficiency of the evidence point, we consider only the evidence and reasonable inferences that tend to support the jury's finding, and we disregard all evidence and inferences to the contrary. *Responsive Terminal Sys. Inc. v. Boy Scouts of Am.*, 774 S.W.2d 666, 668 (Tex.1989). If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987).

When we review an "insufficient evidence" or factual sufficiency of the evidence point, we consider, weigh and examine all of the evidence which supports or undermines the jury's finding. *Plas–Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We review the evidence, keeping in mind that it is the jury's role, not ours, to judge the credibility of the evidence, to assign the weight to be given to testimony, and to resolve inconsistencies within or conflicts among the witnesses' testimony. *Corpus Christi Teachers Credit Union v. Hernandez*, 814 S.W.2d 195, 197 (Tex.App.—San Antonio 1991, no writ). We then set aside the verdict only when we find that the evidence standing alone is too weak to support the finding or that the finding is so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

The jury was asked to determine the difference between the value of the properties GXG agreed to convey to Texacal and the value of the properties actually received by Texacal. GXG contends Texacal presented no evidence of the market value of the properties. GXG also contends the Purchase and Sale Agreement does not specify which properties the cash payment and promissory note apply to.

Although the contract does not specify that the promissory note for $550,000 is to be applied to the purchase of the Knox trust properties, the note itself states that the "[f]irst payment is due and payable 30 days subsequent to Texacal receiving assignment of property and interest on Exhibit 'A'." [sic] There is no dispute that only the Knox trust properties are described in the Exhibit "A" attached to the promissory note.

It is not necessary for Texacal to prove the market value of the properties as the deficiency in the conveyance is not the result of fraud or mutual mistake. *See, e.g., George v. Hesse*, 100 Tex. 44, 93 S.W. 107, 107–08 (1906) (measure of damages in fraudulent conveyance is difference between contract price and reasonable market value); *Cox v. Barton*, 212 S.W. 652, 654 (Tex.Comm'n App. 1919, judgm't adopted) (applying measure of damages for fraud to case of mutual mistake). The nearest parallel to the instant situation is one where a vendor contracts to convey a full interest to a buyer and a price for the full interest is agreed upon, but the

vendor is capable of conveying only a fractional interest. *See Atkin v. Cobb,* 663 S.W.2d 48, 50 (Tex.App.—San Antonio 1983, writ dism'd w.o.j.). The buyer may elect to accept partial specific performance with abatement in the purchase price proportionate to the deficiency or defect. *Id.* at 51 (citing *Fant v. Howell,* 547 S.W.2d 261, 265 (Tex.1977)). It makes no difference whether the buyer is aware that the vendor does not have full title at the time of the agreement and may be unable to convey full title. *See English v. Jones,* 154 Tex. 132, 274 S.W.2d 666, 669 (1955).

O'Connor, Texacal's president, testified that the total price of the Knox trust properties was $550,000, of which he estimated the Schmaling Trust comprised 10%. GXG did not deny or refute that the Schmaling Trust comprised 10% of the total properties. Texacal indisputably received three-thirds of the Schmaling Trust properties, but only one-third of the remaining properties instead of the three-thirds contracted for. Texacal does not deny its obligation for the Schmaling Trust properties, valued at $55,000 (10% of $550,000). The disputed amount of the note is, therefore, 90% of $550,000, or $495,-000. This price was agreed upon for a three-thirds interest. Texacal received a one-third interest. The $495,000 price requires a proportionate abatement of two-thirds, or $330,-000. This is exactly the amount of damages the jury found.

 Furthermore, equity requires relief. The jury found that GXG represented it would convey a three-thirds interest in the Knox trust properties, but delivered nearly two-thirds less. Qualifying the conveyance with a phrase in the deed that could mean "more or less" does not prevent a material deficiency from arising. *See Maddox v. Worsham,* 415 S.W.2d 222, 227 (Tex.Civ. App.—Amarillo 1967, writ ref'd n.r.e.); *Arrott v. Smith,* 225 S.W.2d 639, 642 (Tex.Civ. App.—Austin 1949, no writ). The general rule is that when a misrepresentation, however innocent, is made as to the size of the conveyance, the right of the purchaser is to have what the vendor can convey, with an abatement of the purchase price proportionate to the shortfall between the representa-

tion and the reality. *Mitchell v. Zimmerman,* 4 Tex. 75, 81 (1849). Because the properties were priced by GXG as a package, rather than valued as separate lots, it is appropriate to abate the package price.

We hold the evidence legally and factually sufficient to support the jury's findings. GXG's tenth and eleventh points of error are overruled.

### 9. *Hearsay and Exception*

 By its twelfth point of error, GXG complains the trial court erred by refusing to admit the deposition testimony of Robert Dougherty. GXG contends Dougherty's testimony falls within the hearsay exception of admission of a party opponent.

GXG attempted to offer into evidence the deposition testimony of Robert Dougherty which was given in a different proceeding in which neither Dougherty, Texacal, nor O'Connor was a party. The subject of Dougherty's testimony was information he claimed was known to O'Connor prior to the closing. Texacal objected on the basis of hearsay. The trial court found it to be hearsay and refused to allow it into evidence.

RULE 801(e)(2) provides, in relevant part, "[a] statement is not hearsay if the statement is offered against a party and is his own statement." TEX.R. CIV. EVID. 801(e)(2); *Reviea v. Marine Drilling Co.,* 800 S.W.2d 252, 257 (Tex.App.—Corpus Christi 1990, writ denied). A statement by an agent or servant concerning a matter within the scope of his agency or employment and made during the existence of the relationship may be offered as an admission by the party opponent. TEX.R. CIV. EVID. 801(e)(2)(D).

 GXG claims Dougherty was either an agent or an employee of Texacal. The fact of agency must be established before a declaration can be admitted. *Texas Gen. Indem. v. Scott,* 152 Tex. 1, 253 S.W.2d 651, 655–56 (1952); *see also Buchoz v. Klein,* 143 Tex. 284, 184 S.W.2d 271, 271 (1944) (agency relationship cannot be presumed; it must be proved). An agent is a person who consents to act on behalf of and subject to the control of another, the principal, who has manifested consent that the agent shall so

act. *Herschbach v. City of Corpus Christi,* 883 S.W.2d 720, 732 (Tex.App.—Corpus Christi 1994, writ denied). Agency may be established by circumstances, such as the relation of the parties and their conduct concerning the transaction in controversy. *Cherokee Water Co. v. Forderhause,* 727 S.W.2d 605, 612 (Tex.App.—Texarkana), *rev'd on other grounds,* 741 S.W.2d 377 (Tex. 1987).

Dougherty was employed as Texacal's production superintendent and was authorized to perform a study on the oil and gas reserves of the South Texas properties. He did not serve as an officer or director of Texacal. He delivered a report to O'Connor. Beyond that, there is no evidence he contributed any input or preparation to the Purchase and Sale Agreement. There is no indication that Dougherty acted in any capacity as the sole representative of Texacal. *See Wellington Oil Co. of Del. v. Maffi,* 136 Tex. 201, 150 S.W.2d 60, 63 (1941); *Mays v. First State Bank of Keller,* 247 S.W. 845, 846 (Tex. Comm'n App.1923, judgm't adopted) (principal is charged with knowledge possessed by agent in those cases in which the officer or agent is the sole representative of a corporation in the transaction in question). Dougherty never testified to any participatory acts or input nor did he claim to have a role in the purchase and sale negotiations. GXG offered no evidence to show that the scope of Dougherty's duties as production superintendent authorized him to participate in negotiations, and we find no evidence in the record that he did. He had no role in the execution of the Purchase and Sale Agreement. GXG does not explain how Dougherty's deposition testimony concerned anything within the scope of his employment as production supervisor, nor is there any indication that he acquired relevant knowledge while acting on behalf of Texacal. *See Taylor v. Taylor,* 88 Tex. 47, 29 S.W. 1057, 1058 (1895) ("the knowledge of an agent is not imputed to the principal under circumstances where the agent does not acquire his knowledge in the transaction of his principal's business."). These facts do not establish that Dougherty was a Texacal

agent. Therefore, any knowledge he may have had cannot be imputed to Texacal.

Furthermore, although GXG argues that the contents of Dougherty's deposition amount to an opposing party's admission, Dougherty did not testify as to what O'Connor said; he does not quote O'Connor nor does he assert that O'Connor made a statement. *Cf. Herzing v. Metropolitan Life Ins. Co.,* 907 S.W.2d 574, 580 (Tex.App.—Corpus Christi 1995, writ denied) (witness recounted declarant's affirmative statements); *Fojtik v. First Nat. Bank of Beeville,* 752 S.W.2d 669, 671 (Tex.App.—Corpus Christi 1988) (witness quoted speaker), *writ denied per curiam,* 775 S.W.2d 632 (Tex.1989). Dougherty only states his personal belief, formed as a result of what O'Connor "indicated." Without knowing what O'Connor said, the accuracy of Dougherty's perception is impossible to ascertain.

We hold the trial court properly excluded the evidence as hearsay. *See Turner, Collie & Braden, Inc. v. Brookhollow, Inc.,* 642 S.W.2d 160, 167 (Tex.1982) (defining hearsay). GXG's twelfth point of error is overruled.

10. *Balance Due on the Promissory Note*

By its thirteenth point of error, GXG asserts the trial court properly disregarded the jury's finding that the outstanding balance due on the promissory note was $13,200, but erred in recalculating the note's balance as $81,284.34. GXG contends the trial judge failed to refer to the evidence in making his computations. GXG argues that the calculations it offered, which result in a balance of $558,889.43, are the only calculations which should be adopted. Any offsets allowed, GXG asserts, should be applied against the final balance of $558,889.43.

In a cross-point, Texacal agrees that the trial court erred in computing the balance of the note and urges us to reinstate the jury's finding of $13,200.

■ GXG does not state or explain the rationale for its calculations. Its arguments and calculations ignore fundamental generally accepted principles of accounting.[8] GXG

---

8. The Financial Accounting Standards Board, a private entity, establishes generally accepted ac-

argues, without citing authority, that the $330,000 difference in the values contracted for and received should be credited as of August 21, 1995, rather than to the beginning balance of the note. We disagree. As discussed under points ten and eleven, the remedy for a situation where less land is conveyed than contracted for and the buyer accepts partial performance is an abatement in the purchase price proportionate to the deficiency. Therefore, the $330,000 credit is properly applied against the beginning balance of the promissory note.

GXG's calculations also fail to apply payments to the balance as they were received, waiting instead to deduct them as a lump sum on August 21, 1995. Basic accounting principles require that payments on a debt be credited against the balance on the day they are received. Interest then accrues on the new balance. Over time, payments erode the debt until, on the final due date, it is paid in full. If this were not so, retirement of debt would be impossible. The accrual of interest on the balance of a debt would result in an outstanding balance yet due on the "payoff date" when all of the debtor's payments are applied as a single sum. Equity is not served by utilizing GXG's unexplained method of accounting.

We conclude there is sufficient evidence in the record to allow us to determine the correct balance due on the note.[9] The promissory note, dated April 9, 1991, provides the beginning balance of $550,000 and the simple interest rate of ten percent per annum, to begin accruing as of April 1, 1991. The note also recites that the funds from the Yates property, when released from suspense, are to be applied to the principal of the note. In January 1993, the parties agreed to an order granting Texacal a temporary injunction against GXG's foreclosure attempts. The terms of the agreed order provide that, when received by GXG, the Yates funds are to be applied "to accrued and unpaid interest through and including August 1, 1991, then to outstanding and unpaid principal." We interpret the order as meaning that a credit was to be posted against the interest accrued as of August 1, 1991, and then the remainder of the Yates money was to be posted against the note's balance as of the date of the order, February 23, 1993.[10] GXG used these dates in its calculations and Texacal has not shown that other dates are applicable. We have determined that Texacal is entitled to an abatement of $330,000 on the initial balance. The calculations provided by GXG recite the dates on which payments from, or on behalf of Texacal, were received. Using this data, we performed the following calculations:

| | |
|---|---:|
| Balance of 4-1-9 | $ 550,000.00 |
| Less price abatement found by jury | − 330,000.00 |
| Balance after abatement | 220,000.00 |
| | |
| Plus interest (4-1-91 to 8-1-91) | |
| [220,000 × 10% × (123/365)][11] | + 7,413.70 |
| Less Yates funds (per Agreed Order) | |
| Amount applied to Interest | − 7,413.70 |
| Balance as of 8-1-91 | 220,000.00 |
| | |
| Plus interest (8-2-91 to 1-13-92) | |
| [220,000 × 10% × (165/365)] | + 9,945.21 |
| Less payment from Texacal | − 10,000.00 |
| Balance as of 1-13-92 | 219,945.21 |
| | |
| Plus interest (1-14-92 to 3-13-92) | |
| [219,945.21 × 10% × (60/365)] | + 3,615.54 |
| Less payment from Texacal | − 10,000.00 |
| Balance as of 3-13-92 | 213,560.74 |

Plus interest (3-14-92 to 5-25-92) [12]

counting principles.

9. Only figures that are documented in the record or calculable are utilized. For example, O'Connor testified that Texacal had assigned income to GXG totaling some $50,000, but there is no corroborating evidence for this figure and it is not taken into consideration in our own calculations. Also, in early 1992 GXG sent letters to pipeline owners informing them of GXG's plans to foreclose on Texacal's holdings and directing them to send monies due to Texacal to GXG instead. There is no evidence any of the recipients complied with GXG's request and no allowance is made in our calculations.

10. A total of $163,487.21 was received for the Yates property. A credit of $7,413.70 is applied to the interest accrued from April 1, 1991 to August 1, 1991; the remaining amount of $156,073.51 is applied to the note's balance as of the date of the order.

11. Balance X interest rate X days accrued/365.

12. The exact date of the May 1992 payment is not in the record. However, a tape recorded conversation between Brad Gatlin and Gwen Knox on May 20, 1992, indicates that the payment had not yet been received as of that date. We selected Monday, May 25, 1992 as a compro-

[213,560.75 × 10% × (73/365) ] + 4,271.21
Less payment from Texacal − 2,800.00

Balance as of 5–25–92 215,031.96

Plus interest (5–26–92 to 1–22–93
[215,031.96 × 10% × (242/365) ] + 14,256.91
Less payment from Mesa [13] − 1,434.80

Balance as of 1–22–93 227,854.07

Plus interest (1–23–93 to 2–22–93)
[227, 854.08 × 10% × (31/365) ] + 1,935.20
Less payment from Mesa − 1,434.80

Balance as of 2–22–93 228,354.47

Plus interest for 2–23–93
[228,354.48 × 10% × (1/365) ] + 62.56
Less Yates funds (per Agreed Order)
Amount applied to note's balance − 156,073.51

Balance as of 2–23–93 72,343.52

Plus interest (2–24–93 to 3–22–93)
[72,343.54 × 10% × (27/365) ] + 535.14
Less payment from Mesa − 1,434.80

Balance as of 3–22–93 71,443.87

Plus interest (3–23–93 to 4–22–93)
[71,443.88 × 10% × (31/365) ] + 606.78
Less payment from Mesa − 1,434.80

Balance as of 4–22–93 70,615.85

Plus interest (4–23–93 to 5–22–93)
[70,615.87 × 10% × (30/365) ] + 580.40
Less payment from Mesa − 1,434.80

Balance as of 5–22–93 69,761.45

Plus interest (5–23–93 to 6–22–93)
[69,761.47 × 10% × (31/365) ] + 592.49
Less payment from Mesa − 1,434.80

Balance as of 6–22–93 68,919.15

Plus interest (6–23–93 to 7–22–93)
[68,919.16 × 10% × (30/365) ] + 566.46
Less payment from Mesa − 1,434.81

Balance as of 7–22–93 68,050.80

Plus interest (7–23–93 to 8–21–95) [14]
[68,050.81 × 10% × (760/365) ] + 14,169.48

Balance as of 8–21–95 $ 82,220.28

■ The difference between our calculations and that of the trial court is almost $1,000. Where the trial court erred in computing damages, we may reform the amount of damages. *Atlas Chem. Indus., Inc. v. Anderson,* 514 S.W.2d 309, 319 (Tex.Civ. App.—Texarkana 1974), *aff'd,* 524 S.W.2d 681 (Tex.1975).

We sustain GXG's thirteenth point of error. Texacal's cross-point is overruled.

### 11. *Texacal's Cross–Points*

By two additional cross-points of error, Texacal complains the trial court erred in disregarding the jury's answers to questions three (second part only), four, five, six, eleven, and twelve. Texacal contends there was legally and factually sufficient evidence to support the jury's findings.

■ A court cannot disregard a jury finding unless the issue is immaterial or the finding is unsupported by the evidence. *Spencer v. Eagle Star Ins. Co. of Am.,* 876 S.W.2d 154, 157 (Tex.1994); *L & F Distrib.,* 941 S.W.2d at 279. We review the evidence in the light most favorable to the jury finding, considering only the evidence and inferences tending to support that finding. *Dowling v. NADW Mktg., Inc.,* 631 S.W.2d 726, 728 (Tex.1982); *Dodd v. Texas Farm Prod. Co.,* 576 S.W.2d 812, 814–15 (Tex.1979). If we find more than a scintilla of evidence to support the jury's determination of the issue, we must reinstate that portion of the jury's verdict that was disregarded and enter an appropriate judgment. *Dowling,* 631 S.W.2d at 728; *James v. Vigilant Ins. Co.,* 674 S.W.2d 925, 926 (Tex.App.—Amarillo 1984, writ ref'd n.r.e.); *Tubb v. Bartlett,* 862 S.W.2d 740, 744–45 (Tex.App.—El Paso 1993, writ denied). However, undisputed evidence that allows only one logical inference, even though contrary to the jury's finding, is not disregarded. *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 51 n. 1 (Tex.1997); *see Wininger v. Ft. Worth & D.C. Ry. Co.,* 105 Tex. 56, 143 S.W. 1150, 1152 (1912); *Texas & N.O. Ry. Co. v. Rooks,* 293 S.W. 554, 556–57 (Tex.

mise date between May 21, 1992 and May 30, 1992. May 31, 1992, a Sunday, was excluded as mail is not delivered on Sundays. The choice of an earlier or later date has a negligible effect on calculations.

13. Mesa paid $10,043.61 to GXG between January 22, 1993 and July 22, 1993. GXG's calculations do not note the precise dates or amounts of each payment, but the evidence suggests a stream of payments. In the interest of equity and for purposes of our calculations, we presume equal payments of $1,434.80 were made on the twenty-second day of each month from January to June 1993 with a final payment of $1,434.81 in July 1993.

14. GXG used August 21, 1995 as the ending date in its calculations. It is also the date the jury returned its verdict.

Comm'n.App.1927) (overruling motion for rehearing).

Whether the findings are supported by the evidence is resolved under the standard of review for challenges to the legal sufficiency of the evidence. *L & F Distrib.*, 941 S.W.2d at 279; *McAlpin v. Sanchez*, 858 S.W.2d 501, 508 (Tex.App.—Corpus Christi 1993, writ denied). A question is immaterial when it should not have been submitted, or when it was properly submitted but has been rendered immaterial by other findings. *Spencer*, 876 S.W.2d at 157. A question which calls for a finding beyond the province of the jury, such as a question of law, may be deemed immaterial. *Id.* If jury findings render other findings immaterial, then the trial court may properly disregard them; otherwise, the trial court has no authority to disregard them and commits reversible error in so doing. *Thedford v. Missouri Pac. R.R. Co.*, 929 S.W.2d 39, 45 (Tex.App.—Corpus Christi 1996, writ denied). We consider only evidence and inferences supporting the findings and disregard all contrary evidence and inferences. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995); *Cantu v. Butron*, 921 S.W.2d 344, 348 (Tex.App.—Corpus Christi 1996, writ denied). There must be more than a scintilla of evidence to support the jury's answers in order to establish that the trial court erred in disregarding the jury's findings. *See Holloway v. Skinner*, 898 S.W.2d 793, 796 (Tex.1995); *L & F Distrib.*, 941 S.W.2d at 279. There is more than a scintilla of evidence "where the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Burroughs Wellcome*, 907 S.W.2d at 499 (quoting *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994)).

The second part of question three directed the jury to decide what "other damages," in addition to the abatement in the purchase price, Texacal was entitled to as a result of GXG's failure to convey all of the property promised. The jury found damages totaling $49,500.

The basis for these "other damages" is found in the testimony of Ted O'Connor who stated that Texacal was forced to defend itself in multiple lawsuits against royalty owners, lessors, and other operators, including two against Knox's brother, because the deficient conveyance had greatly reduced its anticipated income and led to problems meeting operating expenses and payments to royalty owners. The attorney's fees totaled approximately $49,500. Texacal expressly sought recovery of these costs. GXG did not dispute Texacal's incurrence of these costs; but argues only that Texacal is not entitled to reimbursement.

In Texas, attorney's fees expended in litigation with third parties are not generally recoverable as damages if not provided for by statute or by agreement between the parties. *City of Garland v. Booth*, 895 S.W.2d 766, 771 (Tex.App.—Dallas 1995, writ denied). There is no agreement between the parties, and no statute authorizing recovery of attorney's fees incurred in litigation with third parties arising from breach of the original parties' contract. However, under principles of equity, when a party incurs expenses in defending a lawsuit that would not have arisen but for the actions of the other party to the original contract, attorney's fees related to that prior lawsuit involving a third person can be recovered. *See e.g., Hartford Cas. Ins. Co. v. Walker County Agency, Inc.*, 808 S.W.2d 681, 689 (Tex. App.—Corpus Christi 1991, no writ); *Baja Energy, Inc. v. Ball*, 669 S.W.2d 836, 838–39 (Tex.App.—Eastland 1984, no writ) (discussing at length equitable foundations of recovery of attorney's fees in breach of contract case). Additionally, a party can recover exemplary damages in the form of attorney's fees from another party when they are for expenses incurred in defending a lawsuit in which the first party would not have been required to participate but for the actions of the other party. *See Hartford Cas. Ins. Co.*, 808 S.W.2d at 689; *Baja Energy, Inc.*, 669 S.W.2d at 838–39.

The jury decided that GXG promised to convey 100% of the properties to Texacal, instead made a grossly deficient conveyance to Texacal, and was not excused from performing on its promise to convey more property. Texacal's legal problems clearly stem

from and are a direct consequence of GXG's breach of the sale and purchase agreement which resulted in diminished income to Texacal and an inability to meet its obligations to other interest holders.

The jury is empowered to compute damages, *Srite v. Owens–Illinois, Inc.*, 870 S.W.2d 556, 563 (Tex.App.—Houston [1st Dist.] 1993), *rev'd on other grounds, Owens–Illinois, Inc. v. Burt*, 897 S.W.2d 765 (Tex. 1995), and the undisputed evidence supports the award of $49,500 for attorney's fees. An appellate court cannot substitute its judgment for that of the jury, even if the court would have decided the issue differently, where the jury determination is supported by some evidence. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988). By the same token, a trial court cannot disregard a finding of the jury where the evidence supports the jury's award. We conclude the trial court erred (1) by disregarding the jury's answer to the second part of question three and (2) by failing to award Texacal an offset of $49,500 for other damages caused by GXG's breach of the sale and purchase agreement.

■ Question four asked the jury whether Texacal's failure, if any, to comply with the agreement was excused. The jury was instructed: (1) that failure to comply is delaying compliance beyond a reasonable period, and (2) such failure would be excused by GXG's previous failure to comply with a material obligation of the same agreement. The jury found that Texacal was excused from complying with the agreement.

GXG's failure to comply with a material obligation of the Purchase and Sale Agreement arose from the deficient conveyance. Under the agreement, Texacal was obliged to fund the promissory note. The jury answered in the first part of question three that the difference in value between the properties promised and the properties conveyed was $330,000. Texacal was excused from performing to this extent, *i.e.*, Texacal did not have to pay for the properties contracted for and not received.

The trial court did not disregard the jury's answer to Question four. The $330,000 was credited to the initial balance of the promissory note. Texacal is not excused from its obligation to pay accrued interest on the adjusted initial balance of the promissory note ($220,000), calculated from the date agreed upon. Even though the terms of the promissory note provide that payments need not be made until thirty days after the Knox trust properties have been conveyed, the note expressly states that interest would start accruing on April 1, 1991. GXG's failure to perform completely did not stop the accrual of interest from that day. Likewise, the term for recovery of attorney's fees expended in efforts to collect on the note is not lost to GXG because GXG's collection efforts arose from Texacal's failure to make scheduled payments on the note, even after Texacal accepted, in October 1992, that GXG would not convey the remaining two-thirds of the Knox trust properties.[15]

Question five, regarding the balance of the promissory note, has been largely addressed under GXG's thirteenth point of error. Texacal explained the basis of the jury's findings: after deducting the $330,000 deficiency from the $550,000 balance, the note's beginning balance was $220,000. From that, the jury deducted $160,000 for the Yates Funds and $49,500 for third-party litigation costs, then added back approximately $2,500 as interest from May 1993 through August 1995 to arrive at the final figure of $13,200.

As our own calculations establish, the jury's finding of a balance of $13,200 is incorrect. Furthermore, the finding of $13,200 is not supported by the evidence because Texacal's and Mesa's payments are not accounted for, and over two years accrued interest is excluded. The trial judge did not err in disregarding the jury's answer to Question five.

■ In its answer to Question six, the jury found that there was no excuse for GXG's failure to comply with the Purchase and Sale Agreement. In accordance with the instructions and definitions provided with the

---

15. Texacal's original petition in this suit, filed October 30, 1992, seeks, inter alia, abatement of the purchase price to reflect the deficiency in the conveyance.

question, the jury's answer reflects that Texacal did not defraud GXG, nor was the Purchase and Sale Agreement entered into as a result of a mutual mistake. In its petition, Texacal sought abatement of the purchase price, and cancellation of the note and deed of trust, mutually exclusive remedies.

Texacal claims the trial court disregarded the jury's answer, but it fails to explain how this is reflected in the judgment. As discussed under GXG's ninth through eleventh points, the jury found that GXG failed to convey a promised three-thirds interest and the failure amounted to $330,000 in damages. The trial court abated the purchase price by that amount and then utilized the recomputed price in its calculations of the note's balance. Texacal clearly does not want to rescind the deal and is, therefore, not entitled to be relieved of paying for the properties it received. We do not see a disregard for this finding in the trial court's judgment. Texacal's first cross-point is partially sustained and partially overruled. The judgment will be corrected to reflect the jury's finding of other damages incurred by Texacal in the amount of $49,500.

■ In its second cross-point, Texacal complains the trial court disregarded the jury's answers to Questions eleven and twelve. Questions 11 and 12 concern the deed of trust which listed some, but not all, of the properties. A one-third interest in ninety-percent of the properties in Exhibit A were conveyed. A three-thirds interest in all of the properties in Exhibit B were conveyed. Some, but not all, of the properties from each exhibit were listed on the deed of trust.

The questions are identical, except the substitution of "B" for "A" in Question 12. Question 11 reads, in relevant part, as follows:

> Other than the properties listed on the Deed of Trust . . . did the parties intend that all of the other Exhibit "A" Trust properties be listed on the Deed of Trust? Answer "Yes" or "No."
>
> The omission of properties on the Deed of Trust may have resulted from mutual mistake. A mutual mistake results from a mistake of fact common to both parties if both parties had the same misconception

concerning the fact in question. A mistake by one party but not the other is not a mutual mistake. A mutual mistake may also arise when the parties to an agreement have identical intent and understanding of the terms to be embodied in a proposed written agreement, but, in the effort to reduce the agreement to writing, a mistake was made so that the writing does not present the intended agreement.

> The omission of properties on the Deed of Trust may have resulted from the unilateral mistake of one party, but not the other, coupled with fraudulent or inequitable conduct of the other party.

Answer: No

In answer to both Questions eleven and twelve, the jury found that the parties had not intended to include all of the properties on the deed of trust. The trial court disregarded both answers, decreed that "GXG, INC. has a contractual deed of trust lien upon all properties sold, transferred and conveyed by GXG, INC. to TEXACAL OIL & GAS, INC., . . . . including, but not limited to, the properties [described on the attached pages]." The trial court further declared that the promissory note was secured by an implied vendor's lien and that such lien applied to all of the properties. Finally, the trial court ordered foreclosure of the properties.

The jury found, and we agree, that there was no "fraudulent or inequitable conduct." Clearly this cannot be the basis of the trial court's disregard for the jury's answer. Nor can we discern a mutual mistake. O'Connor testified that he had expected only the Knox trust properties to be security for the promissory note, although he later agreed to the inclusion of some of the South Texas properties as additional collateral. Knox testified that Gatlin told her all of the properties, both in the Knox Trust and South Texas, would be included on the deed of trust. The three pages attached to the contract which name, but do not describe, the properties conveyed include fifty-nine listings. The list attached to the deed of trust which names and describes the properties securing the note is two pages long. Even a cursory inspection

would have immediately revealed that far fewer than fifty-nine properties were covered by the deed of trust. Knox was not prevented from inspecting the attached pages to either document. There is no mutual mistake.

The trial court gave no reason for declaring that the deed of trust applied to all of the properties conveyed by GXG, and we can find no basis for the court's action. If the parties had agreed and intended to encumber all of the properties, they could have easily memorialized such an agreement. It appears the parties intended to include only selected properties on the deed of trust.

The trial court also decreed that GXG retained an implied vendor's lien on all of the properties. The function of an implied equitable lien is to enforce a purchase money obligation not otherwise secured. *White v. Downs*, 40 Tex. 225, 226, 231 (1874). The fact that the note was secured by a deed of trust affirmatively shows the parties' intention to rely solely upon the security provided by the deed of trust. Numerous authorities support the rule that where the vendor takes a mortgage on the land sold or on other property to secure part of the purchase money, he is presumed to have waived his equitable lien in the absence of affirmative evidence that he intended to retain it, since it is reasonable to suppose that where the parties specify the security by express agreement, they must have intended to exclude an implied lien. *Cresap v. Manor*, 63 Tex. 485, 486–87 (1885); *Flanagan v. Cushman*, 48 Tex. 241, 244 (1877) (where land is sold for debt and the debt is contractually secured by other collateral, equity does not infer that the vendor is entitled to a different and additional security from that contracted for); *Zapata v. Torres*, 464 S.W.2d 926, 930 (Tex. Civ.App.—Dallas 1971, no writ); *Dyson v. Dysart*, 250 S.W. 716, 717 (Tex.Civ.App.— Amarillo 1923, no writ); *Noblett v. Harper*, 136 S.W. 519, 520 (Tex.Civ.App.—Texarkana 1911, no writ).

Texacal's second cross-point challenging the trial court's disregard for the jury's answers to Questions eleven and twelve is sustained.

The courts of appeals are empowered to affirm, modify, correct, reform, reverse and dismiss, or reverse and render the judgment that the court below should have rendered. TEX.R.APP. P. 43.2.

Accordingly, we reform the judgment to delete the trial court's (1) reformation of the deed of trust and (2) imposition of an implied vendor's lien. We modify the order of judicial foreclosure to apply only to the properties on the deed of trust. We modify the judgment to reflect the correct balance of the promissory note due GXG to be $82,220.28, and we grant Texacal an offset of $49,500.00 on that amount for other damages the jury found Texacal suffered. As reformed and modified, the judgment is affirmed.